903 F.2d 186
 58 USLW 2683, Fed. Sec. L. Rep. P 95,229,
16 Fed.R.Serv.3d 774,
RICO Bus.Disp.Guide 7474
 HOXWORTH, Dan H., Hoxworth, Louise A., on behalf of
themselves and all others similarly situated
v.
BLINDER, ROBINSON & CO., INC., Blinder, Meyer, Appellants in
89-1437.
GAVRON, Bradley, on behalf of himself and all others similarly situated
v.
BLINDER, ROBINSON & CO., INC. and Blinder, Meyer and Cox,
John J., Appellants in 89-1438.
BROWNSTEIN, Barry, on behalf of himself and all others
similarly situated
v.
BLINDER, ROBINSON & CO., INC. and Blinder, Meyer, Appellants
in 89-1439.
Appeal of BLINDER INTERNATIONAL ENTERPRISES, INC.,
Appellants in 89-1440, 89-1441, 89-1442.
 Nos. 89-1437 through 89-1442.
 United States Court of Appeals,
Third Circuit.
 Argued July 12, 1989.
Decided May 9, 1990.
 
 J. Dennis Faucher (argued), Michael R. Lastowski, Ellen Meriwether, Saul, Ewing, Remich & Saul, Philadelphia, Pa., Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago,Ill., Stephen A. Whinston, Stephen D. Ramos, Berger & Montague, P.C., Philadelphia, Pa., Michael J. Freed, Kenneth A. Wexler, Much Shelist Freed Denenberg Ament & Eiger, P.C., Chicago, Ill., Don R. Lolli, Beckett & Steinkamp, Kansas City, Mo., Stuart H. Savett, Kohn, Savett, Klein & Graf, Philadelphia, Pa., David B. Zlotnick, David B. Zlotnick & Associates, Bala Cynwyd, Pa., Donald B. Lewis, Philadelphia, Pa., for appellees.
 James D. Crawford (argued), Gregg V. Fallick, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellants in Nos. 89-1440, 89-1441, 89-1442.
 James D. Crawford (argued), Sherry A. Swirsky, Gregg Vance Fallick, Daniel Cantu-Hertzler, Elizabeth F. Warner, Schnader, Harrison, Segl & Lewis, Philadelphia, Pa., for appellants in Nos. 89-1437, 89-1438, 89-1439.
 Jane L. Dalton, Amy E. Wilkinson, Duane, Morris & Heckscher, Philadelphia, Pa., for amicus curiae Lillian Blinder.
 Before HIGGINBOTHAM, BECKER and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This is an appeal from an extremely broad preliminary injunction designed to protect a potential future damages remedy in a class action alleging securities fraud and civil RICO violations. Plaintiffs are a class of investors allegedly defrauded by defendants in connection with plaintiffs' purchases and sales of various penny stocks. Defendant Blinder, Robinson & Co. ("Blinder, Robinson") is the securities dealer through which plaintiffs purchased and sold their stock, and defendant Meyer Blinder is the President of both Blinder, Robinson and Blinder International Enterprises, Inc. ("Blinder International"), the corporate parent of Blinder, Robinson. The preliminary injunction ordered Meyer Blinder to repatriate some $11 million dollars transferred abroad during the course of this litigation, over $4 million of which belongs to Blinder International, which is not a party in the litigation. Moreover, it prohibits defendants, inter alia, from transferring any funds outside the ordinary course of business and from transferring any funds outside the country without prior approval by the district court.
 
 
 2
 Defendants raise a host of claims on appeal. Most fundamentally, they argue that a district court lacks the power to protect a potential future damages remedy by a preliminary injunction encumbering assets, even assuming that the usual criteria for obtaining a preliminary injunction are met. Although we agree that such a remedy must be be reserved for extraordinary circumstances, we reject defendants' argument that such relief can never be appropriate.
 
 
 3
 Defendants also raise various narrower arguments as to why the injunction must be set aside. Many of these we reject, and some we decline to consider at this juncture. However, we agree with defendants that the injunction suffers at least one fatal defect: the district court made no attempt to ensure that the value of assets encumbered bore some reasonable relationship to the likely amount of plaintiffs' expected recovery. For this reason, we conclude that the preliminary injunction must be set aside.
 
 
 4
 Defendants also ask us to reverse the district court's order certifying a class of allegedly defrauded investors, especially because the district court did so without any findings or explanation. The class certification order, however, is not itself reviewable before a final merits judgment. Moreover, we conclude that we cannot review the class certification order at this time under the doctrine of pendent appellate jurisdiction, because the preliminary injunction must be vacated regardless of whether or not the class was correctly certified.
 
 
 5
 Finally, we briefly touch upon two ancillary issues raised in this appeal. We conclude that the district court abused its discretion in waiving the security requirement of Fed.R.Civ.P. 65(c), and we decline to address whether the district court exceeded the scope of its authority to enjoin Blinder International, which is not yet a defendant in this case.I. FACTS AND PROCEDURAL HISTORY
 
 A. Background
 
 6
 Defendant Meyer Blinder is the Chairman, Chief Executive Officer, and President of defendant Blinder, Robinson, a Colorado-based securities firm. Blinder, Robinson is a wholly owned subsidiary of Blinder International, which is also incorporated under Colorado law. Blinder International, which was not a party in the district court proceedings, derives an "overwhelming" percentage of its revenues from Blinder, Robinson, App. 633, although Blinder International holds at least eight different affiliates or subsidiaries. Meyer Blinder and his wife Lillian together own about 52% of Blinder International, the remainder of which is held by some 9000 public shareholders. Meyer Blinder is also the President of Blinder International.
 
 
 7
 Blinder, Robinson specializes in underwriting, brokering and trading "penny stocks," certain low-priced, high risk equity securities for which there is often no well-developed trading market. Blinder, Robinson was the sole underwriter for about thirteen of the securities at issue in this litigation and was the largest market-maker for aftermarket trading in all but one.[1] Blinder, Robinson also executes retail trades, usually as a principal (trading directly with its individual customers), but sometimes as an agent (arranging trades between its customers and charging commissions for that service).
 
 
 8
 Plaintiffs Dan and Louise Hoxworth, Bradley Gavron, and Barry Brownstein all purchased penny stocks from Blinder, Robinson during 1985. Between January and April of 1988, they filed three separate, but substantially similar, actions in the district court claiming securities fraud. Each complaint listed both Meyer Blinder and Blinder, Robinson as defendants, but none listed Blinder International.[2] The Hoxworth plaintiffs later moved to amend their complaint pursuant to Fed.R.Civ.P. 15(a) to add Blinder International as a defendant. This motion remained pending when the preliminary injunction was issued.
 
 
 9
 Plaintiffs alleged that Blinder, Robinson had defrauded them in violation of both section 12(2) of the Securities Act of 1933 ("the 1933 Act")[3] and section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act").[4] They seek to hold Meyer Blinder jointly and severally liable as a "controlling person" under section 15 of the 1933 Act[5] and section 20(a) of the 1934 Act.[6] In addition, plaintiffs pleaded claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-1968, with the alleged securities law violations serving as predicate offenses. Finally, plaintiffs pleaded pendent claims for violations of various provisions of the Pennsylvania Securities Act, 70 Pa.Stat.Ann. Sec. 1-101 et. seq., and for breach of common law fiduciary duties.
 
 
 10
 The three actions were consolidated for purposes of pretrial proceedings. Collectively, plaintiffs sought certification, pursuant to Fed.R.Civ.P. 23(b)(3), of a class of plaintiffs defined as all persons who purchased or sold any of roughly eighteen different securities through Blinder, Robinson between September 1, 1984 and December 31, 1986.[7] The named plaintiffs themselves collectively lost under $7300 from their trading. On May 19, 1989, without findings or explanation, the district court certified the requested class.
 
 
 11
 On January 12, 1989, plaintiffs moved for a preliminary injunction freezing Meyer Blinder's assets and prohibiting Blinder, Robinson from making transfers out of the ordinary course of business without notice to them and prior court approval. In May, 1989, the district court conducted a four-day evidentiary hearing on the preliminary injunction motion.
 
 
 12
 B. The Evidence at the Preliminary Injunction Hearing
 
 
 13
 At the hearing, plaintiffs presented evidence of two allegedly fraudulent or misleading courses of conduct routinely followed by Blinder, Robinson brokers. The first involved Blinder, Robinson's failure to disclose to its customers its allegedly excessive markups and markdowns. The National Association of Securities Dealers (NASD), a self-regulating organization of which Blinder, Robinson is a member, has promulgated guidelines for the maximum markups and markdowns that a broker-dealer may charge customers with whom it trades as a principal.
 
 
 14
 Plaintiffs' expert testified that he had analyzed Blinder, Robinson's trading activity in each of two class securities, Telstar Satellite Corp. and Touchstone Software Corp., for selected periods of time within the class period--January 1986 for Telstar Satellite and September 4, 1984 through September 6, 1984 for Touchstone Software. The analysis was done by comparing prices customers actually paid for those securities, derived from Blinder, Robinson's stock activity records, against the prevailing market price, derived from Blinder, Robinson's pricing sheets. Based on those comparisons, the expert testified that Blinder, Robinson's markups for those securities during those periods substantially exceeded what was permitted under the NASD guidelines. Plaintiffs' expert testified further that because Blinder, Robinson dominated the market of the securities he had analyzed during the intervals of his analysis, a more appropriate calculation would have employed a lower baseline--and therefore resulted in significantly higher markups--than the one plaintiffs actually employed.[8] The expert testified that the time frames and sample sizes of his analysis were large enough to be statistically significant, that he had selected these securities and time frames randomly, and that an analysis of other class securities during other intervals within the class period would probably have yielded a similar conclusion about excessive markups.
 
 
 15
 Defendants' expert testified that plaintiffs had misread Blinder, Robinson's pricing sheets in determining the prevailing market prices and that Blinder, Robinson did not dominate the markets of the analyzed securities during the analyzed periods. In cross-examining plaintiffs' expert, defendants also questioned the randomness of plaintiffs' selection of securities and time frames to analyze.
 
 
 16
 Blinder, Robinson's second course of conduct involved allegedly misleading statements made to its clients about the firm's "research department." Blinder, Robinson brokers were trained to solicit new business in a carefully scripted sequence of three consecutive phone calls made to prospective customers. Blinder, Robinson distributed to its brokers a reference manual which contained, among other things, a suggested outline of the three-call sequence. During the second call, brokers were instructed to state that "[o]ur research department is always preparing reports on a number of stocks." App. 2408. In fact, however, the research department consisted of only one individual, who assembled information only about companies whose securities Blinder, Robinson had underwritten.
 
 
 17
 Plaintiffs also introduced undisputed evidence chronicling transfers of large sums of money from New York to Hong Kong by Meyer Blinder and Blinder International during the course of this litigation. In March and April of 1989, barely two months after plaintiffs had moved for a preliminary injunction to encumber defendants' assets, Meyer Blinder transferred some $6.6 million dollars from New York to Hong Kong, where he bought 90 day certificates of deposit with the Hong Kong branch of Chase Manhattan Bank, and with the Hong Kong Bank and Shanghai Banking Corporation. During roughly the same period, Blinder International transferred about $4.4 million from New York to the Hong Kong branch of Chase Manhattan.
 
 
 18
 Plaintiffs further introduced essentially uncontradicted evidence regarding Blinder, Robinson's sagging financial fortunes. During 1988, Blinder, Robinson's net worth fell from about $24.0 million to about $9.2 million, and its unsegregated cash fell from over $16 million to under $4 million. Blinder, Robinson has been forced to close 27 of its 85 branch offices, while its sales force has shrunk from about 1800 brokers to about 500. One of defendants' own witnesses testified that this contraction was due to the considerable adverse publicity Blinder, Robinson has received, and continues to receive, in the national media regarding its sales and marketing practices. Moreover, Blinder, Robinson currently faces various administrative proceedings in about 24 different jurisdictions.
 
 
 19
 Defendants presented evidence regarding Meyer Blinder's and Blinder International's extensive business dealings in Hong Kong. Blinder International owns several affiliates located in Hong Kong, and Meyer Blinder testified at his deposition that he does business in Hong Kong and "always look[s] for more [business] opportunities" there. App. 771.
 
 C. The District Court's Findings
 
 20
 On the basis of this evidence, the district court found that plaintiffs were likely to prevail on the merits of their various securities claims. The district court found that Blinder, Robinson's markups and markdowns were excessive,[9] that information about such markups and markdowns was material, and that Blinder, Robinson intentionally withheld that information from its customers. Moreover, the district court found that Blinder, Robinson intentionally mislead its customers about the scope of its research department and that its misleading statements in this regard were material. Thus, the district court concluded that plaintiffs were likely to succeed on their cause of action against Blinder, Robinson under rule 10b-5.
 
 
 21
 Moreover, because the district court held that section 12(2) applies to aftermarket trading, it concluded that plaintiffs were likely to succeed in all their claims under section 12(2), not just those involving purchases in which Blinder, Robinson was underwriting a primary distribution. Because the court found that Meyer Blinder had actual knowledge of the conduct complained about, it concluded that plaintiffs were likely to succeed in their claims against Blinder himself under section 15 of the 1933 Act and section 20(a) of the 1934 Act. Additionally, the district court found that because defendants had invested funds taken from plaintiffs in enterprises engaged in interstate or foreign commerce, plaintiffs were likely to succeed on the merits of their RICO claims under 18 U.S.C. Sec. 1962(a) and -(d).
 
 
 22
 The district court next concluded that plaintiffs were likely to suffer irreparable injury absent a preliminary injunction designed to ensure that their potential future judgment would be satisfied. The court determined that in light of Blinder, Robinson's significant financial and legal difficulties, that firm was unlikely to have sufficient assets to satisfy plaintiffs' potential future judgment against it. As for Meyer Blinder, the court found that at his deposition he had failed to identify the certificates of deposit he had purchased in Hong Kong and failed to offer a plausible business explanation for his asset transfers. Based on those findings, the district court concluded that Blinder was attempting to put his assets beyond the reach of the court, which threatened the irreparable injury of making plaintiffs' likely future judgment against him unenforceable.
 
 
 23
 The district court also found that defendants would not be harmed by an injunction designed to protect plaintiffs' potential future judgment and that the public interest would be well served by such an injunction. Therefore, the district court granted plaintiffs a preliminary injunction encumbering defendants' assets, which was far broader in scope than the one plaintiffs had requested.
 
 D. The District Court's Order
 
 24
 Paragraph 1 of the order enjoined defendants, as well as "all those persons with whom they act in concert," from "transferring funds and/or liquid assets outside of this country" without prior notice to plaintiffs and court approval.[10] Paragraph 2 ordered Meyer Blinder to repatriate all funds he had transferred overseas, "individually or jointly with Lillian Blinder," since January 1, 1989; to deposit those funds into a bank within the Eastern District of Pennsylvania; and to disburse those funds only after having given notice to plaintiffs and obtained court approval. Paragraph 3 ordered Meyer Blinder to cause Blinder International to repatriate all funds it had transferred overseas since January 1, 1989, and imposed the same restrictions on those funds as the restrictions imposed in paragraph 2. Paragraph 4 enjoined Meyer Blinder from liquidating, encumbering or transferring his interest in Blinder International without prior notice to plaintiffs and court approval, and paragraph 5 prevented Blinder International from liquidating, encumbering or transferring its interest in Blinder, Robinson without prior notice to plaintiffs and court approval. Paragraph 6 prohibited "[d]efendants and all those acting in concert with them" from transferring assets outside the ordinary course of business and required all transfers within the ordinary course of business exceeding $250,000 to be reported to the plaintiffs. Paragraph 7 required Meyer Blinder to file an updated financial statement with the plaintiffs every 30 days, and paragraph 8 waived the usual requirement, see Fed.R.Civ.P. 65(c), that plaintiffs obtaining a preliminary injunction post a security bond.[11]
 
 
 25
 Defendants appeal both the grant of the preliminary injunction and the class certification. In addition, Blinder International appeals the preliminary injunction insofar as it encumbers its assets.[12]
 
 
 26
 II. CAN A DISTRICT COURT ISSUE A PRELIMINARY INJUNCTION TO
 
 
 27
 PROTECT A DAMAGES REMEDY?
 
 
 28
 Appellants' threshold argument posits that a district court is simply without the power to issue a preliminary injunction in order to protect a potential future damages remedy, even if the usual requirements for obtaining preliminary equitable relief have been met.[13] In their submission, a federal court is powerless to protect a potential future damages remedy against a recalcitrant defendant with highly liquid assets, no matter how wrongful its conduct, how bad the injury it caused, or how brazen its attempt to evade judgment by secreting assets. Appellants argue that this baldly stated view is compelled by De Beers Consolidated Mines v. United States, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945). The Fifth Circuit agrees. See In re Fredeman Litigation, 843 F.2d 821 (5th Cir.1988), which held that an injunction was inappropriate to protect a potential future damages remedy under RICO even assuming "that the defendants are scoundrels who will try to escape judgment." Id. at 826. The First Circuit disagrees. See Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 53 (1st Cir.1986) ("[A] preliminary injunction can be granted when it is necessary to protect the damages remedy...."). This court has never squarely addressed the question. For the reasons that follow, we conclude that De Beers should not be read as broadly as appellants suggest.[14]
 
 
 29
 Appellants highlight language from De Beers that, considered in isolation, might seem to support their position:
 
 
 30
 To sustain the [preliminary injunction] would create a precedent of sweeping effect. This suit ... is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestering his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.
 
 
 31
 325 U.S. at 222-23, 65 S.Ct. at 1135-36.
 
 
 32
 De Beers, however, must be understood in its context. It involved a suit by the government to enjoin future antitrust violations by De Beers. The government sought no damages for past violations, for the applicable statutes gave the district courts no authority to award such relief. See id. at 219-20, 65 S.Ct. at 1133-34. Thus the government did not seek, nor could it have sought, a preliminary injunction to protect any potential future damages remedy to which it might become entitled. Instead, it argued that unless the court preserved a source of funds against which it could later threaten a contempt sanction, the government would have no practical means of enforcing whatever injunction might be granted. Given this background, the narrowness of the Court's holding becomes apparent. The preliminary injunction was inappropriate not because the plaintiff was seeking money damages, as appellants here contend; to the contrary, the injunction was inappropriate precisely because the plaintiff could not recover any money damages. Thus the Court's comment that the preliminary injunction "deal[t] with a matter wholly outside the issues in the suit." Id. at 220, 65 S.Ct. at 1134.
 
 
 33
 The De Beers Court expressly distinguished cases in which "an interlocutory injunction was granted with respect to a fund or property which could have been the subject of the provisions of any final decree in the cause." Id. (citing Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940)). Legally as well as economically, money is fungible--if a debtor with $100,000 cash in its general coffers owes $10,000 to someone, there is no meaningful distinction among which of those dollars is actually paid to satisfy the debt. Thus, when a plaintiff seeks money damages and the funds encumbered by the preliminary injunction are worth no more than the amount reasonably in controversy, the injunction does involve "a fund or property which could [be] the subject of the provisions of [a] final decree in the cause," rather than "a matter wholly outside the issues in the suit." In this respect, the case before us is far closer to Deckert than De Beers.
 
 
 34
 Deckert itself reinforces this conclusion. Deckert involved a claim by allegedly defrauded purchasers of securities. The seller was alleged to be insolvent, although it had deposited the buyers' money in a trust controlled by a third party. The buyers sought to place the seller into receivership, to liquidate the seller's assets, and to satisfy their claims from such assets to whatever extent possible. Additionally, the buyers sought and obtained a preliminary injunction preventing the third party from transferring the assets of the seller in its possession pending adjudication of the buyers' claims. The Court upheld the preliminary injunction:
 
 
 35
 We hold that the injunction was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill.... As already stated, there were allegations that [the seller] was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against [the seller], without recourse to the fund in the hands of [the third party], would be inadequate.
 
 
 36
 311 U.S. at 290, 61 S.Ct. at 234 (emphasis added). The Court's prior determination that the buyers' underlying claims against the seller were equitable in nature, see id. at 288, 61 S.Ct. at 233, could not have been critical to its decision to allow the preliminary injunction freezing the buyer's assets, in light of the Court's generic use of the word "legal" in the passage quoted above. Instead, the Court justified the injunction as reasonably necessary to preserve the status quo, and thus to ensure the satisfiability of a potential future judgment ordering the transfer of money from defendant to plaintiffs--whether it be deemed legal or equitable in nature.
 
 
 37
 Our reading of De Beers finds further support in United States v. First National City Bank, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965). In First National, the United States was attempting to collect taxes supposedly owed to it by a foreign corporation possibly beyond the jurisdiction of the district court. While attempting to obtain personal jurisdiction over the taxpayer, the government sought a preliminary injunction ordering the bank, over which the court clearly had personal jurisdiction, to freeze the taxpayer's accounts in its foreign branches. Despite Justice Harlan's objection in dissent that De Beers was controlling, the Court approved the injunction:
 
 
 38
 The temporary injunction issued ... seems to us to be eminently appropriate to prevent further dissipation of assets.... If such relief were beyond the authority of the District Court, foreign taxpayers facing jeopardy assessments might either transfer assets abroad or dissipate those in foreign accounts under control of American institutions before personal service on the foreign taxpayer could be made. Such a scheme was underfoot here, the affidavits aver. Unlike De Beers ..., there is here property which would be "the subject of the provisions of any final decree in the cause." ... We conclude that this temporary injunction is "a reasonable measure to preserve the status quo...."
 
 
 39
 Id. at 385, 85 S.Ct. at 532 (citing Deckert ). First National thus turns upon the necessity of preserving the government's opportunity to recover money allegedly due it. The government had argued, and the Court agreed, that De Beers was inapplicable because "the trial court [in De Beers ] could award only injunctive relief, whereas in [First National ] the judgment, were the Government successful, would be a money award." Id. at 398, 85 S.Ct. at 539 (Harlan, J., dissenting). First National did not turn upon whether the government's action to recover that money was better characterized as legal or equitable, an issue the Court did not even address.[15]
 
 
 40
 Thus De Beers, read in light of Deckert and First National, simply held that a defendant's money may not be encumbered by a preliminary injunction when the final merits judgment sought by plaintiffs cannot involve a transfer of money from defendant to plaintiffs. In short, De Beers is simply inapplicable to cases in which a litigant seeks money damages, as the plaintiffs do here.
 
 
 41
 Of course, just because a district court enjoys the power to protect a potential future damages remedy with a preliminary injunction does not mean that such an injunction is appropriate in a run-of-the-mill damages action. The traditional requirements for obtaining equitable relief must be met. These include, in this context, a showing that plaintiffs are likely to become entitled to the encumbered funds upon final judgment and a showing that without the preliminary injunction, plaintiffs will probably be unable to recover those funds. Neither of these was met in De Beers. As to success on the merits, "the possibility of an ultimate levy was too remote in practical terms to justify freezing the property from the outset of the litigation." First National, 379 U.S. at 398, 85 S.Ct. at 539 (Harlan, J., dissenting) (discussing De Beers ). As to irreparable injury, the government's evidence consisted only of one conclusory affidavit submitted by the government accusing De Beers of secreting assets--in other words, "a mere statement of belief that the defendant can easily make away with or transport his money or goods." De Beers, 325 U.S. at 222, 65 S.Ct. at 1135.
 
 
 42
 Against this background, the passage from De Beers on which appellants rely so heavily, see supra at 195, can be understood more sensibly. De Beers was concerned that not just "any action for personal judgment" should result, "on a mere statement" by a plaintiff, in burdensome encumbrances imposed on the assets of a defendant as yet found liable to no one. A case in which recovery is especially likely is not just "any action," however, and a case in which asset secretion has been proven involves more than just "a mere statement" of irreparable injury. We have not yet addressed the extent to which these factors are present in this case; so far, we have held only that De Beers does not preclude a preliminary injunction regardless of their presence.[16]
 
 III. THE PRELIMINARY INJUNCTION
 
 43
 "To obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." Morton v. Beyer, 822 F.2d 364, 367 (3d Cir.1987) (emphasis in original). "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1143 (3d Cir.1982). "In addition ..., 'the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." ' " Morton, 822 F.2d at 367 n. 3 (citations omitted). "In reviewing the grant of a preliminary injunction, we are is limited to determining whether there has been 'an abuse of discretion, an error of law, or a clear mistake on the facts.' " ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir.1987) (citation omitted).
 
 A. The Scope of the Injunction
 
 44
 If a court imposes a preliminary injunction encumbering a defendant's assets in order to protect a potential future money judgment, the court must make some attempt reasonably to relate the value of the assets encumbered to the likely value of the expected judgment. This principle is implicit in De Beers itself: in this case, for example, if only the named plaintiffs were suing and if their claims were worth at most $25,000, then a preliminary injunction encumbering well over $10 million of assets to protect the likely judgment obviously would involve funds that could not "be[ ] the subject of the provisions of any final decree," 325 U.S. at 220, 65 S.Ct. at 1133, and thus would be governed by De Beers, not Deckert. See supra at 195 - 96.
 
 
 45
 Alternatively, the principle grows out of any of the usual preliminary injunction criteria. Thus, when "success on the merits" is quantified to varying degrees, a plaintiff likely to succeed in winning a judgment of at least $25,000 is not necessarily likely to win a judgment of at least $10 million. Similarly, a plaintiff expecting to win a judgment liberally estimated to be worth $25,000 might suffer an irreparable injury absent a preliminary injunction designed to ensure the availability of at least that amount, but is unlikely to suffer any injury whatsoever absent a preliminary injunction designed to ensure the availability of $10 million. Harm to a defendant is a third factor to be considered, and a defendant--even an unsavory one--is harmed more than necessary by an injunction encumbering far more of its assets than are at stake in the underlying litigation. Finally, the public interest is hardly served by the sheer in terrorem effect of allowing plaintiffs to impose (or even threaten to impose) burdens on defendants above and beyond those necessary to protect plaintiffs' otherwise unsatisfiable claims.[17]
 
 
 46
 We begin by assuming that the district court correctly concluded that plaintiffs are likely to succeed on the merits of their claims and that they will probably suffer irreparable injury absent some preliminary injunction designed to protect their likely final judgment. Even on those assumptions, however, the injunction must be vacated because the district court made no attempt whatsoever to tailor its scope appropriately.
 
 
 47
 The district court made no findings estimating the likely size of the judgment plaintiffs were likely to obtain. Even if such a finding were ours to make in the first instance, we can locate no evidence within the voluminous record helpful on this score. Presumably, a plaintiff's complaint will request the maximum amount possible consistent with the good-faith pleading requirements of Fed.R.Civ.P. 11, which could at least form an upper limit on the potential scope of the injunction; here, however, even the plaintiffs' complaints fail to specify the amount of damages they are seeking. The only conceivably relevant quantitative evidence plaintiffs point to in their court of appeals brief is a list compiling the dollar value of various Blinder, Robinson underwritings during a twelve year period. As an estimate of the size of Blinder, Robinson's likely liability to these plaintiffs, however, this list is virtually worthless.
 
 
 48
 Nor did the district court estimate the value of the assets encumbered by its injunction. Paragraphs 2 and 3 of its order require the return to the Eastern District of Pennsylvania of roughly $11 million, the amount transferred abroad by Meyer Blinder and Blinder International since January 1, 1989. The preliminary injunction, however, sweeps even more broadly than that. Paragraph 1 restricts the international transfer of all funds and liquid assets of Meyer Blinder; Blinder, Robinson; and (presumably) Blinder International that are currently inside the United States. Moreover, paragraph 6 prohibits the transfer of these parties' assets outside the ordinary course of business. In short, the preliminary injunction encumbers, to one degree or another, all of the assets of Meyer Blinder; Blinder, Robinson; and Blinder International.
 
 
 49
 The district court made findings as to the value of Blinder, Robinson's net worth (about $9 million) and the value of its unsegregated cash (about $4 million), but no findings as to the value of its assets. Nor did the district court make findings as to the value of Meyer Blinder's or Blinder International's assets. Although it is hardly our job to make such determinations in the first instance, we note that plaintiffs' own evidence indicates that Blinder, Robinson owned over $27 million of assets in early 1989, and Blinder International owned some $77 million of assets in early 1988 (including, we presume, Blinder, Robinson's then-net worth of about $24 million). App. 1199, 1201. Moreover, it is obvious from the record that the value of Meyer Blinder's assets runs well into the tens of millions of dollars.
 
 
 50
 In sum, the district court made no attempt to estimate the probable amount of the plaintiffs' likely final judgment, and no attempt to relate the scope of its world-wide, multi-million dollar asset dragnet to that amount. We do not suggest that a district court must, at a preliminary stage of the litigation, make an extended effort to match the value of assets encumbered to the expected value of the judgment dollar for dollar. However, some attempt to tailor the scope of the injunction to the likely size of the judgment is necessary, although the determination regarding how precise that tailoring must or can be in any particular case lies within the equitable discretion of the district court. In this case, we need not enter any line-drawing quagmires regarding how much tailoring is enough, for the district court made no attempt whatsoever to match the scope of its injunction to the most probable size of the likely judgment. Its failure to do so constitutes an abuse of discretion, which requires that we vacate the injunction.[18]
 
 B. Likelihood of Success on the Merits
 
 51
 The district court found that the plaintiffs were likely to succeed on the merits of their claims and likely to suffer irreparable injury absent a preliminary injunction. If we left those findings intact, the district court presumably would attempt to impose a narrower injunction on remand, and appellants would presumably appeal that injunction on many of the same grounds they have advanced here. These matters have already been briefed and argued to us. In order to avoid unnecessary relitigation, and to give guidance to the district court on remand, we now address appellants' arguments regarding likelihood of success on the merits and probability of irreparable injury.
 
 
 52
 Appellants present several arguments why, in their view, plaintiffs are unlikely to succeed on the merits of their various claims. They submit that each of Blinder, Robinson's two courses of conduct is not actionable; they assert that particular named plaintiffs are unlikely to prevail on the merits; and they argue that particular claims are unlikely to succeed.1. Claims Predicated on Blinder, Robinson's Failure to Disclose its Markup and Markdown Policies.
 
 
 53
 Appellants contend that plaintiffs' claims cannot be predicated on Blinder, Robinson's failure to disclose its markup and markdown policies because NASD regulations do not give rise to a private right of action. For the latter proposition, they correctly cite Newman v. Rothschild, 651 F.Supp. 160 (S.D.N.Y.1986). Newman, however, explains further that "[v]iolations of ... NASD rules ... may be probative in demonstrating a course of conduct amounting to fraud." Id. at 162-63. We agree.
 
 
 54
 Omissions are "material" for purposes of federal securities law if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). See Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (adopting the TSC Industries definition of materiality in the rule 10b-5 context); Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 641 & n. 18 (3d Cir.1989) (applying the TSC Industries definition to claims under section 12(2)). The district court applied this standard and concluded that whether "Blinder Robinson's markups were far in excess of the guidelines of the NASD" was a matter that "a reasonable investor would consider ... in determining whether or not to invest in the class securities." Dist.Ct.Op. at 14-15.
 
 
 55
 Blinder, Robinson's allegedly excessive markups and markdowns are not actionable because they violated NASD rules, but that does not imply that Blinder, Robinson's failure to disclose its pricing policies is immunized from coverage under other rules. Given the district court's findings about the extent of Blinder, Robinson's markups, its conclusion that that information was material--and therefore should have been disclosed--is not clearly erroneous.[19]
 
 
 56
 2. Claims Predicated on Blinder, Robinson's Statements About its Research Department.
 
 
 57
 Appellants contend that the district court erred in predicating likelihood of success on the merits upon Blinder, Robinson's alleged half-truths regarding its "research department."[20] Appellants argue that its statements in this regard amounted to mere "puffing." Again, appellants rely on Newman:
 
 
 58
 Courts have recognized a category of statements by brokers which are better characterized as "puffery" than as material misstatements. When a broker calls a bond "marvelous," or says a stock is so "red hot" that the investor "could not lose," or claims that his primary purpose is to make money for the customer, the reasonable investor is presumed to understand that this is nothing more than "the common puff of a salesman," not a material factual misstatement.
 
 
 59
 651 F.Supp. at 163 (citations omitted). Strictly speaking, the securities laws recognize no distinct "puffing" exception. To say that a statement is mere "puffing" is, in essence, to say that it is immaterial, either because it is so exaggerated ("You cannot lose.") or so vague ("This bond is marvelous.") that a reasonable investor would not rely on it in considering the " 'total mix' of [available] information." TSC Industries, 426 U.S. at 449, 96 S.Ct. at 2132.
 
 
 60
 Applying the correct legal definition of materiality, the district court found that "[w]hether or not a 'buy' recommendation (and implicitly a subsequent 'sell' recommendation) is based on the study of a research department is a material fact" and "[w]hether or not a salesman would recommend only securities which his company was underwriting is also a material fact." Dist.Ct.Op. at 13. These findings were supported by testimony of one of defendants' own experts, who conceded that the relevant statements in Blinder, Robinson's training manual were, in the context in which they were intended to be made, materially misleading. App. 660. Thus, the district court's findings that statements about the research department were material, and therefore something more than just "puffing," are not clearly erroneous.[21]
 
 
 61
 3. Claims of the Named Plaintiffs.
 
 
 62
 Appellants argue further that the district court failed to make any findings regarding whether any of the named plaintiffs was charged an excessive markup without disclosure or was told misleading statements about the research department. Once the district court certified the class, however, the relevant question for purposes of determining plaintiffs' entitlement to preliminary relief became whether the class as a whole was likely to succeed on the merits, not whether idiosyncratic factors specific to some individual plaintiff's claims--even an individual named plaintiff's claims--substantially altered that particular plaintiff's likelihood of success. Of course, the district court was bound to consider whether the various putative classmembers' likelihood of success on the merits turned mostly on case-specific factors in deciding whether or not to certify a class in the first place. See Fed.R.Civ.P. 23(a)(2), 23(b)(3). Moreover, the district court was bound to consider whether idiosyncratic factors made the named plaintiffs' likelihood of success substantially different from that of most other classmembers in deciding whether or not to allow them to represent the class. See Fed.R.Civ.P. 23(a)(3), 23(a)(4). At this stage, we do not decide whether the district court abused its discretion in evaluating these considerations. We hold only that given otherwise undisturbed findings that a plaintiff class as a whole is likely to succeed on the merits, a defendant cannot preclude preliminary class-wide relief simply by arguing that the named plaintiffs themselves are unlikely to prevail. Compare Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (class action not mooted when named plaintiffs' claims become moot).[22]4. Rule 10b-5 Causation Requirement.
 
 
 63
 Appellants contend further that plaintiffs are unlikely to succeed on their claims under rule 10b-5 because they failed to establish the requisite causal connection between appellants' conduct and plaintiffs' alleged damages. We disagree.
 
 
 64
 In Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court held that in cases seeking to predicate rule 10b-5 liability upon omissions--as opposed to affirmative misrepresentations--reliance, which "provides the requisite causal connection between a defendant's [alleged fraud] and a plaintiff's injury," Basic, 108 S.Ct. at 989, will be presumed from the materiality of the information not disclosed. See 406 U.S. at 153-54, 92 S.Ct. at 1472-73. In Sharp v. Coopers & Lybrand, 649 F.2d 175 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982), we held that in cases involving both omissions and misrepresentations, a unitary burden of proof on the reliance issue should be set according to a context-specific determination of where that burden more appropriately lies. See id. at 188. We rejected as unworkable "a strict application of the omissions-misrepresentations dichotomy," which "would require the trial judge to instruct the jury to presume reliance with regard to the omitted facts, and not to presume reliance with regard to the misrepresented facts." Id.
 
 
 65
 This case is predicated upon two allegedly fraudulent courses of conduct directed at the class as a whole--the failure to disclose Blinder, Robinson's excessive markups and the failure to clarify true but misleading statements about the research department. The first of these involves "pure" omissions as to which the burden-shifting rationale of Affiliated Ute is fully applicable. The second involves half-truths, which, although "analytically ... closer to lies than to nondisclosure," L. Loss, Fundamentals of Securities Regulation 960 (2d ed. 1988), are obviously closer to omissions than are "pure" misrepresentations. Moreover, we believe that the half-truths about Blinder, Robinson's research department would foreseeably influence investors' decisions, and were intended and especially likely to do so. Sharp deemed all these considerations relevant in determining the burden of proof as to reliance in mixed omission/misrepresentation cases. See 649 F.2d at 189.
 
 
 66
 Given all these factors, the district court did not err, having concluded that Blinder, Robinson's nondisclosures and half-truths were material, in excusing plaintiffs from their burden of proving reliance on those nondisclosures and half-truths.[23] Appellants were entitled to try to rebut the presumption that the plaintiffs relied, see, e.g., Rochez Brothers, Inc. v. Rhoades, 491 F.2d 402, 410 (3d Cir.1974), cert. denied, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976), but they did not attempt to do so. Therefore, we reject appellants' argument that plaintiffs are unlikely to succeed on their rule 10b-5 claims because of their failure to establish the requisite casual connection.[24]
 
 
 67
 5. Applicability of Section 12(2) to Aftermarket Trading.
 
 
 68
 Appellants contend that the district court erred in determining that section 12(2) liability could attach to material misstatements or omissions made in connection with aftermarket trading. Even though plaintiffs obviously would not be entitled to any double recovery were they to succeed under alternative section 12(2) and rule 10b-5 theories of liability, plaintiffs' likelihood of success on the merits of their section 12(2) claims arising out of aftermarket purchases could conceivably increase the probable size of their likely judgment. This is so because appellants' section 12(2) liability would be calculated according to different, potentially more pro-plaintiff, measures of damages than would their liability under rule 10b-5.[25]
 
 
 69
 Despite the potential significance in this case of the question whether section 12(2) applies to aftermarket purchases, we decline to review the district court's determination that it does. Remarkably, no Court of Appeals has decided this question, and the district courts to have considered it are badly split. See Mix v. E.F. Hutton & Co., Inc., 720 F.Supp. 8, 10-11 & n. 3 (D.D.C.1989) (collecting cases). Answering this important and difficult question is unnecessary at this juncture, and the parties' briefs and oral arguments focused on it only tangentially. Finally, although limiting the availability of section 12(2) to primary distributions could decrease the likely size of plaintiffs' expected judgment, we cannot even guess whether it does, much less whether that decrease is significant enough to contract the permissible scope of a preliminary injunction. Under these circumstances, we deem it prudent to defer resolution of the issue until another day.
 
 
 70
 6. The Civil RICO Claims.
 
 
 71
 Finally, appellants contend that the plaintiffs are unlikely to succeed on their civil RICO claims. This objection is potentially very important. Both section 12(2) and rule 10b-5 limit plaintiffs' recovery to some variation of a compensatory or restitutionary measure of actual damages, see supra note 25, but RICO permits a successful civil plaintiff to recover treble damages, see 18 U.S.C. Sec. 1964(c). Thus, finding that the class was likely to succeed in elevating its predicate securities claims into RICO claims could treble the expected value of the judgment, and with it, the value of assets potentially subject to pre-judgment encumbrance.
 
 
 72
 The district court held that plaintiffs were likely to succeed on claims brought under 18 U.S.C. Sec. 1962(a), which provides, in pertinent part:
 
 
 73
 It shall be unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to use or invest ... any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate or foreign commerce.
 
 
 74
 The district court found that Blinder, Robinson had engaged in a pattern of racketeering activity[26] and concluded that "the proceeds of this activity have been invested in other enterprises and are being moved out of the country." Dist.Ct.Op. at 15-16. On the basis of these findings, the district court concluded that plaintiffs were likely to succeed on their RICO claims against appellants under sections 1962(a) and 1962(d), which prohibits conspiracy to violate section 1962(a).
 
 
 75
 Appellants contend that plaintiffs are unlikely to succeed on their RICO claims to the extent that they define the RICO "enterprise" as Blinder, Robinson itself, one of the defendant RICO "persons."[27] We have held that a RICO "enterprise" cannot itself be held liable under 18 U.S.C. Sec. 1962(c).[28] See B.F. Hirsch v. Enright Refining Co., 751 F.2d 628, 633-34 (3d Cir.1984). Enright is of no help to appellants, however, because its holding was limited to claims brought under section 1962(c). Plaintiffs' claims were brought under section 1962(a). In that context, we have held that " 'where a corporation engages in racketeering activities and is the direct or indirect beneficiary of the pattern of racketeering activity, it can be both the [liable] "person" and the "enterprise" under section 1962(a).' " Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1361 (3d Cir.1987) (citation omitted). Appellants' argument is therefore without merit.[29]7. Summary.
 
 
 76
 We reject appellants' arguments that Blinder, Robinson's failure to disclose its excessive markups and its misleading statements about the research department are unlikely to trigger liability under the federal securities laws. We find irrelevant for present purposes appellants' arguments directed solely at the named plaintiffs' likelihood of success on the merits. We reject appellants' arguments that plaintiffs are unlikely to prevail on their rule 10b-5 claims, and we decline to address their argument that section 12(2) is inapplicable to aftermarket trading. As for appellants' RICO arguments, we reject one and decline to address the other two. In sum, we conclude that the district court did not err in concluding that plaintiffs are likely to succeed on the merits.
 
 C. Irreparable Injury
 
 77
 "Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.' " ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 225 (3d Cir.1987) (citation omitted). The district court found that the irreparable injury showing was met by plaintiffs' evidence of Meyer Blinder's substantial transfers of assets "beyond the power of this court," Dist.Ct.Op. at 18, and of Blinder, Robinson's escalating financial difficulties. Thus, the district court reasoned, "[f]ailure to grant the injunction may leave the injured plaintiffs and the class without a remedy or with a judgment against a Blinder, Robinson & Co. that has no more funds." Id. at 27.
 
 
 78
 Appellants contend at the outset that the possibility of an unsatisfied money judgment cannot, as a matter of law, constitute irreparable injury for purposes of granting a preliminary injunction. We find ample authority to the contrary, however. See, e.g., Deckert v. Independent Shares Corp., 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189 (1940) ("[T]here were allegations that [the defendant] was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against [the defendant], without recourse to the fund in the hands of [a third party], would be inadequate."); United Steelworkers v. Fort Pitt Steel Casting, 598 F.2d 1273, 1280 (3d Cir.1979) ("[T]he fact that the payment of monies is involved does not automatically preclude a finding of irreparable injury."); see also, e.g., Teradyne, Inc. v. Mostek Corp., 797 F.2d 43 (1st Cir.1986) (upholding a preliminary injunction issued to protect a potential damages remedy); Foltz v. U.S. News & World Report, 760 F.2d 1300, 1307-09 (D.C.Cir.1985) (holding that the "[i]rrevocable loss" of a cause of action for monetary recovery against an ERISA-covered pension plan would constitute irreparable injury for preliminary injunction purposes); In re Feit & Drexler, Inc., 760 F.2d 406, 416 (2d Cir.1985) ("[E]ven where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by 'transfer[ring] its assets out of the jurisdiction.' " (citation omitted)); Roland Machinery Co. v. Dresser Industries, 749 F.2d 380, 386 (7th Cir.1984) (discussing four situations in which preliminary equitable relief is available because a damages remedy is "inadequate").[30]
 
 
 79
 Appellants, however, cite Morton v. Beyer, 822 F.2d 364 (3d Cir.1987), and A.O. Smith Corp. v. FTC, 530 F.2d 515 (3d Cir.1976), for the proposition that the loss of a monetary recovery cannot constitute irreparable injury. We do not read either of those cases so broadly.
 
 
 80
 Morton reversed a preliminary injunction ordering reinstatement of a government employee who claimed he had been discharged without an adequate pretermination hearing. There was no suggestion that a potential final judgment, which might have included an award of backpay, would go unsatisfied. Thus, the issue in Morton was whether a plaintiff's cash flow problems--i.e. his preference or need for money now rather than later --could constitute sufficient irreparable injury to justify preliminary equitable relief. In that context, we stated that "we do not believe that loss of income alone constitutes irreparable harm." Id. at 372. Morton did not involve the very different question whether never receiving the final relief to which one was most likely entitled--even if it was "only" money--could constitute irreparable injury.
 
 
 81
 In A.O. Smith Corp. v. FTC, 530 F.2d 515 (3d Cir.1976), we found no showing of irreparable injury by plaintiffs who had argued that the cost of complying with a challenged administrative regulation during the time it would take to have the regulation reviewed was unrecoverable--and therefore constituted an irreparable injury. A.O. Smith, however, implicates an interest not present in most preliminary injunction cases--the government's interest in being free to regulate without undue concern about onerous liabilities if the regulation is later struck down. Moreover, despite some language read to the contrary by the dissent, A.O. Smith rejected the view that a monetizable injury which is small in relation to a plaintiff's total assets cannot be irreparable. See id. at 527 n. 9a.
 
 
 82
 Having concluded that the unsatisfiability of a money judgment can constitute irreparable injury, we turn to consideration of the district court's finding that the judgment in this case, absent a preliminary injunction, would probably go unsatisfied. Insofar as the district court found that Blinder, Robinson would probably be unable to satisfy a judgment to the plaintiffs, that finding is not clearly erroneous. See supra at 193 (describing Blinder, Robinson's financial difficulties). The district court's further conclusion that a potential judgment against Meyer Blinder himself would likely be unsatisfiable is more problematic, however.
 
 
 83
 There was no evidence that Meyer Blinder was consuming, dissipating, or fraudulently conveying his quite considerable assets. What Blinder did was shift assets from banks in New York to banks in Hong Kong, where he bought three-month certificates of deposit. The district court thus predicated its finding of irreparable injury upon its conclusion that during the course of the litigation Meyer Blinder had been transferring assets "beyond the reach of this court." Dist.Ct.Op. at 18.
 
 
 84
 We hesitate to construe the district court's reasoning literally, for it would seem to prove too much. For example, it would imply irreparable injury in a case where defendants moved their assets from the Eastern District of Pennsylvania to a local bank in California. We know of no authority for the proposition that a plaintiff is irreparably harmed by having to obtain a merits judgment in one forum and then to execute on that judgment in a different forum. Indeed, the demise of quasi in rem jurisdiction predicated solely upon the presence of a defendant's assets within a jurisdiction strongly suggests otherwise. See Shaffer v. Heitner, 433 U.S. 186, 210 & n. 36, 97 S.Ct. 2569, 2583 n. 36, 53 L.Ed.2d 683 (1977).
 
 
 85
 Perhaps the district court meant that there was no United States forum, which would be bound to give full faith and credit to the district court's merits judgment, in which plaintiffs could reach Meyer Blinder's assets. This conclusion, as well, presents difficulties. For example, to the extent that Meyer Blinder transferred assets from Chase Manhattan Bank in New York to the branch bank of Chase Manhattan in Hong Kong, there appears to be some authority for the proposition that plaintiffs could execute a final judgment against those assets in a district court in New York. See Fed.R.Civ.P. 69 ("The procedure on execution ... shall be in accordance with the practice and procedure of the state in which the district court is held...."); Digitrex, Inc. v. Johnson, 491 F.Supp. 66 (S.D.N.Y.1980) (holding that under New York law, an order freezing a judment debtor's assets served on the main office of a New York bank reaches assets located in foreign branches as well).
 
 
 86
 Perhaps the district court meant that plaintiffs would suffer irreparable injury because the United States does not participate in the international treaty under which Hong Kong affords full faith and credit to foreign judgments of reciprocating nations. See F. Leung, The Commercial Laws of Hong Kong 26 (1987). However, it appears that Hong Kong courts will respect judgments even from countries not covered by Hong Kong's Foreign Judgments [Reciprocal Enforcement] Ordinance. See C. Conroy, Legal Aspects of Doing Business with Hong Kong 166 ("The other way of enforcing a foreign judgment (if there are no reciprocal provisions) is to bring an action based upon it. Generally speaking where the original court has assumed jurisdiction over the judgment debtor in similar circumstances as provided for registration judgments then the Defendant will have no defense.").
 
 
 87
 Finally, the district court might have meant that the burden of having to travel to Hong Kong in order to satisfy a judgment would constitute an irreparable injury even if the judgment were enforceable in Hong Kong. This view garners some support from cases finding that irreparable injury "cannot be doubted" if a defendant is "successful in removing ... assets from the United States." USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94, 98 (6th Cir.1982). Other cases, however, find the requirement met only after considering the likelihood that the particular foreign jurisdiction at issue will fail to allow plaintiffs their day in court. See, e.g., Itek Corp. v. First National Bank of Boston, 730 F.2d 19, 22-23 (1st Cir.1984) (finding irreparable injury only after considering the futility of attempting to obtain a remedy in Iranian courts).
 
 
 88
 On the basis of the foregoing, the district court's finding of irreparable injury, insofar as it was based on Meyer Blinder's overseas asset transfers, appears to be somewhat problematic. However, as we have explained, this aspect of the case presents complex and difficult issues of international law. That complexity counsels against our issuing a ruling when neither the plaintiffs nor the district court has articulated the precise legal theory underlying this aspect of the irreparable injury finding. Although we decline to rule on this issue at this time, we offer our reservations in order to encourage better explanation of the underlying rationale, which would facilitate subsequent appellate review should the district court reimpose a narrower injunction.
 
 D. Other Factors
 
 89
 The district court properly considered the possibility of harm to defendants and the public interest. As to the possibility of harm to defendants, given the volatility and competitiveness of financial markets, we cannot take seriously the district court's findings that defendants would not be harmed by an injunction encumbering at least tens of millions of dollars of their assets. Of course a preliminary injunction causing serious injury to defendants can be justified if it inflicts no more harm than reasonably necessary to prevent plaintiffs who are likely to prevail on the merits from suffering an irreparable injury. We trust that if the district court should choose to reimpose a preliminary injunction on remand, it will tailor the injunction sufficiently to avoid unnecessary harm to the defendants.
 
 
 90
 The district court briefly considered the public interest. We do not believe that this factor adds terribly much to the other factors in this kind of case. Whether the interests of groups harmed by the injunction--for example, Blinder International's public shareholders and the companies Blinder, Robinson is presently underwriting--should be compromised in order to protect the interests of the plaintiff class depends on the strength of the latter's claims as potential judgment creditors and on the possibility for protecting their interests adequately without resorting to the relatively drastic measure of affording relief before trial.
 
 E. Conclusion
 
 91
 Even assuming that the plaintiffs are likely to succeed on all of their claims and that they will probably suffer irreparable injury absent preliminary equitable relief, the injunction imposed by the district court is fatally overbroad. For the most part, we agree with the district court's conclusion that plaintiffs are likely to succeed on the merits, although we decline to address a few of the appellants' arguments to the contrary at this time. We agree with the district court that an unsatisfied money judgment constitutes an irreparable injury, and we will not disturb its finding that Blinder, Robinson would probably be unable to satisfy an adverse judgment. Beyond that, we express no opinion on the irreparable injury point, except our hope that the complicated issue of irreparable injury as it relates to Meyer Blinder's asset transfers will be parsed more carefully on remand. The district court is free to reimpose some sort of preliminary injunction, provided that its scope bears a reasonable relationship to the scope of the underlying litigation.
 
 IV. CLASS CERTIFICATION
 
 92
 Appellants also challenge the district court's May 19, 1989 order certifying a class consisting of all persons who bought or sold any of about eighteen different securities through Blinder, Robinson between September 1, 1984 and December 31, 1986. Appellees respond that this court lacks jurisdiction to review the class certification order at this time.
 
 
 93
 Ordinarily, an order granting or denying class certification is not appealable before final judgment. See Coopers & Lybrand v. Livesay, 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (not appealable under 28 U.S.C. Sec. 1291); Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978) (not appealable under 28 U.S.C. Sec. 1292(a)(1)). The order granting a preliminary injunction was immediately appealable, however. See 28 U.S.C. Sec. 1292(a)(1). Appellants argue that the propriety of the preliminary injunction cannot be determined without also determining the propriety of the class certification order. They claim that because the value of the named plaintiffs' claims are orders of magnitude smaller than the value of the assets encumbered by the injunction, the preliminary injunction could not be upheld unless the class certification order were also upheld. They conclude, therefore, that we must review the class certification order in connection with our review of the injunction under the doctrine of pendent appellate jurisdiction.
 
 
 94
 We agree with appellants' premise that were we to uphold a preliminary injunction of this scope, we could not do so without first reviewing the propriety of the class certification order. However, because we have held that the injunction must be vacated regardless of whether the class was properly certified, we conclude that we lack pendent appellate jurisdiction to review the class certification order at this time.
 
 
 95
 Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir.1982) (in banc), is this court's seminal case on pendent appellate jurisdiction. In Kershner, we held that "a pendent class certification order is not appealable under section 1292(a)(1) unless the preliminary injunction issue cannot properly be decided without reference to the class certification question." Id. at 449. The rationale behind that holding was articulated with a good deal of precision:
 
 
 96
 If the preliminary injunction issue appealable under section 1292(a)(1) cannot be resolved without reference to the otherwise nonappealable class certification issue--either because the latter issue directly controls disposition of the former, or because the issues are, in some other way, inextricably bound--then both issues must be addressed in order to resolve properly the section 1292(a)(1) preliminary injunction issue. In such a situation, the appellate court has no choice: any more limited review would deprive the appellant of his or her congressionally mandated right to a section 1292(a)(1) interlocutory appeal. If, on the other hand, the appellate court can dispose of the section 1292(a)(1) appeal without venturing into otherwise nonreviewable matters, its jurisdiction should be limited accordingly.
 
 
 97
 Id. (emphases in original; footnotes omitted).
 
 
 98
 Section 1292(a)(1) "creates an exception from the long-established policy against piecemeal appeals, which [courts are] not authorized to enlarge or extend." Gardner, 437 U.S. at 480, 98 S.Ct. at 2453. Therefore, we must "approach this statute somewhat gingerly lest a floodgate be opened that brings into the exception many pretrial orders." Switzerland Cheese Assoc., Inc. v. E. Horne's Market, Inc., 385 U.S. 23, 24, 87 S.Ct. 193, 194, 17 L.Ed.2d 23 (1966).
 
 
 99
 Mindful of these warnings, we have consistently refused to extend the doctrine of pendent appellate jurisdiction beyond the precise rationale articulated in Kershner. Thus, a single order is not appealable in its entirety just because a portion of that order is appealable under section 1292(a)(1). See Kershner, 670 F.2d at 445-46, 449. Nor does the existence of an interlocutorily appealable order confer pendent appellate jurisdiction over an otherwise unappealable order just because the two orders arise out of the same factual matrix--the rule urged by the sole Kershner dissenter. See id. at 452-53 (Higginbotham, J., concurring and dissenting). Nor does a class certification order become interlocutorily appealable just because it greatly magnifies the stakes of the underlying litigation. See Tustin v. Heckler, 749 F.2d 1055, 1065-66 (3d Cir.1984). In short, pendent appellate jurisdiction over an otherwise unappealable order is available only to the extent necessary to ensure meaningful review of an appealable order.
 
 
 100
 Under these principles, we conclude that we lack jurisdiction to review the class certification order at this time. Although we agree with appellants that this preliminary injunction could not conceivably be upheld unless the class certification order were also reviewed and upheld, it does not follow that the injunction could not be struck down without reference to the class certification order. Here, we have been able to determine that the injunction cannot stand regardless of whether or not the class was properly certified. Because we have thus "dispose[d] of the section 1292(a)(1) appeal without venturing into otherwise nonreviewable matters," Kershner, 670 F.2d at 449, we have no need--and therefore no power--to examine the class certification order at this time.
 
 V. RULE 65(c)
 
 101
 Appellants argue that the district court erred in granting the preliminary injunction without requiring the plaintiffs to post a security bond. The district court excused the bond requirement because it found that "there is no risk of monetary harm to the defendants" in complying with the preliminary injunction and "because of the chilling effect such a requirement would have on the plaintiffs' ability to proceed with this case." Dist.Ct.Op. at 28. We conclude that the district court erred in failing to require a bond.
 
 Fed.R.Civ.P. 65(c) provides:
 
 102
 Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.
 
 
 103
 On its face, this language admits no exceptions. See Atomic Oil Co. v. Bardahl Oil Co., 419 F.2d 1097, 1100 (10th Cir.1969) ("Rule 65(c) states in mandatory language that the giving of security is an absolute condition precedent to the issuance of a preliminary injunction."), cert. denied, 397 U.S. 1063, 90 S.Ct. 1500, 25 L.Ed.2d 685 (1970). "[T]here are important policies undergirding a strict application of the bond requirement in most injunction granting contexts." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 805-06 n. 9 (3d Cir.1989). " 'An incorrect interlocutory order may harm defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants.' " Id. at 804 (citation omitted). Such protection is important in the preliminary injunction context, for " 'because of attenuated procedure, an interlocutory order has a higher than usual chance of being wrong.' " Id. (citation omitted).[31]
 
 
 104
 Given the text and policies of rule 65(c), this court has interpreted the bond requirement very strictly. No Third Circuit case of which we are aware has upheld a district court's excuse of the requirement. Thus, we have stated that:
 
 
 105
 Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory. We have held previously that absent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error.
 
 
 106
 Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 103 (3d Cir.1988). The "exception[ ]" referred to in Frank's GMC Truck is System Operations, Inc. v. Scientific Games Development Corp., 555 F.2d 1131, 1145 (3d Cir.1977). System Operations, however, did not recognize an exception to rule 65(c). System Operations involved a case in which the defendant faced the potential for substantial monetary losses from compliance with the injunction. In that context, we held that "a district court commits reversible error when it fails to require the posting of a security bond by the successful applicant for a preliminary injunction," id. at 1145, and we expressly reserved the question "whether a court may dispense with the posting of a bond in a case where the injunction raises no risk of monetary harm to the defendant," id. at 1146.
 
 
 107
 At most, therefore, Frank's GMC Truck and System Operations excuse the posting of a bond when complying with the preliminary injunction "raises no risk of monetary harm to the defendant." Id. (emphasis added). To the extent that the district court's holding is based on a determination that complying with the preliminary injunction raised no risk of harm to these defendants, that determination is clearly erroneous. The preliminary injunction prevents the overseas transfer of every last dime of the defendants currently deposited in United States accounts without prior notice to plaintiffs and court approval. It prevents the disbursement of about $11 million dollars from a bank account in the Eastern District of Pennsylvania without prior notice and approval. And it prevents all defendants from transferring any assets anywhere in the world outside the ordinary course of their respective businesses.
 
 
 108
 Meyer Blinder is capable of seeking investment opportunities anywhere around the globe, and Blinder, Robinson is engaged in a business where liquidity and the ability to raise capital, which includes one's own capital, are critical to success, if not survival. Thus, we must reject the proposition that complying with such an injunction creates no risk of financial harm to them.
 
 
 109
 The district court also relied on its view that requiring a bond would "chill[ ]" plaintiffs' ability or willingness to seek preliminary relief. As we noted in Instant Air Freight, "[requiring] a bond may create a barrier to the granting of a preliminary injunction." 882 F.2d at 804. However, "[t]he barrier fulfills one of the purposes of the bond requirement," namely to " 'deter[ ] rash applications for interlocutory orders [by] caus[ing] plaintiff to think carefully beforehand.' " Id. (citation omitted). We conclude that on this record, the district court's chilling concern cannot justify excusing the bond requirement.[32]
 
 VI. APPEAL OF BLINDER INTERNATIONAL
 
 110
 Although not yet a party to the underlying proceeding, Blinder International appeals from the preliminary injunction insofar as it reaches funds of Blinder International.
 
 
 111
 The parties essentially agree on the applicable legal standards. An injunction is binding "only upon the parties to [an] action ... and upon those persons in active concert or participation with them." Fed.R.Civ.P. 65(d). A court "cannot lawfully enjoin the world at large, no matter how broadly it words its decree." Alemite Manufacturing Corp. v. Staff, 42 F.2d 832, 832 (2d Cir.1930). However, "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945). Blinder International concedes that the injunction is valid insofar as it enjoins Blinder International from aiding and abetting violations by Blinder, Robinson or Meyer Blinder. However, Blinder International contends that the injunction goes well beyond that prohibition.
 
 
 112
 We will not dwell on this issue at any length. Pending before the district court is a motion to amend the Hoxworth complaint to add Blinder International as a named defendant. Plaintiffs' section 12(2) claims against Blinder, Robinson give rise to joint and several liability of controlling parties under section 15, "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. Sec. 77o. There is no question that Blinder International controls Blinder, Robinson, and it seems likely that Meyer Blinder's knowledge of the facts giving rise to the section 12(2) claims, see Dist.Ct.Op. at 15, will be imputed to a company of which Meyer Blinder is President and a 52% owner.
 
 
 113
 Similarly, plaintiffs' claims against Blinder, Robinson under rule 10b-5 give rise to joint and several liability of Blinder International unless Blinder International "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation," 15 U.S.C. Sec. 78t(a), which is also hard to square with the district court's findings as to Meyer Blinder's actual knowledge. Thus, we suspect that the question of how far a preliminary injunction can reach Blinder International as a nonparty is likely to be mooted before either we or the district court need to address it again. We therefore decline to consider Blinder International's claims any further at this juncture.
 
 VII. CONCLUSION
 
 114
 Because the preliminary injunction is fatally overbroad, we will vacate it and remand the case for further proceedings consistent with this opinion. On remand, the district court may seek to reimpose a more reasonably tailored injunction, provided that it requires security pursuant to Fed.R.Civ.P. 65(c). We lack appellate jurisdiction to review the class certification order, and we decline to consider issues relating solely to the appeal of Blinder International. Chief Judge Higginbotham concurs in the result.
 
 
 
 [1]
 A securities firm "makes a market" when it agrees to trade blocks of securities wholesale with other broker-dealers at particular prices
 
 
 [2]
 The Gavron complaint also listed as a defendant John Cox, the Blinder, Robinson executive in charge of compliance during the class period. Cox is not involved in the present appeal
 
 
 [3]
 Section 12 provides, in pertinent part:
 Any person who--
 (2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 15 U.S.C. Sec. 77l (1982).
 
 
 [4]
 Section 10 provides, in pertinent part:
 It shall be unlawful for any person ...
 (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors.
 15 U.S.C. Sec. 78j. Pursuant to its rulemaking power under section 10(b), the SEC has promulgated rule 10b-5, which reads, in pertinent part, as follows:
 It shall be unlawful for any person ...
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1988)
 
 
 [5]
 Section 15 provides, in pertinent part:
 Every person who ... controls any person liable under [section 12(2) ] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
 15 U.S.C. Sec. 77o.
 
 
 [6]
 Section 20(a) provides, in pertinent part:
 Every person who ... controls any person liable under [section 10(b) and rule 10b-5] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 15 U.S.C. Sec. 78t(a).
 
 
 [7]
 The district court's certification order listed the following eighteen securities as class securities: ABEK, Inc.; Allertech; American Strategic Metals; Blinder International Enterprises, Inc.; Compagnie Prodel; Compusonics; Continental Connector Industries; DCX, Inc.; Envirosure Management Corp.; Equitex, Inc.; Gateway Communications, Inc.; I-SYS Technology, Inc.; Kiwi Ventures Capital, Inc.; Pierce Ventures, Ltd.; Solar Satellite Communications; Source Venture Capital, Inc.; Telstar Satellite Corp.; and Touchstone Software Corp. The record suggests that Pierce Ventures and Telstar Satellite are different names for the same security, but that Compagnie and Prodel are different securities. Those ambiguities aside, there is some variance between the securities listed in the order granting class certification, those listed in the plaintiffs' complaints, and those referred to as class securities in the opinion granting the preliminary injunction. These matters are immaterial to our disposition of the appeal, so we leave them for the district court to clarify on remand
 Of the class securities, the Hoxworths traded only ABEK; Brownstein traded only DCX, I-SYS, Kiwi and Pierce (later Telstar Satellite); and Gavron traded ABEK, Pierce and Source. Whether Gavron also traded Allertech is disputed. Brownstein actually made money on his trading ISYS and Pierce, and Gavron profited from his trading Pierce and Source.
 
 
 [8]
 The guidelines provide for a maximum markup (or markdown) of 5% above (or below) the prevailing market price of the security. In the case of a customer purchase, for example, if there exists a well-developed interdealer trading market, a dealer cannot charge a customer a price more than 5% above its interdealer ask--i.e. the price at which it sells that security to other dealers. If no well-developed wholesale trading market exists, the dealer cannot charge the customer a price more than 5% above its contemporaneous cost--i.e. the price it would have to pay to purchase that security from a retail customer
 Plaintiffs' analysis used Blinder, Robinson's interdealer ask as the baseline for measuring its markups. If Blinder, Robinson dominated the relevant markets during the relevant times, however, the contemporaneous cost, a figure lower than the interdealer ask, would have been a more appropriate baseline.
 
 
 [9]
 In a footnote in the facts section of their brief, appellants intimate that this finding is clearly erroneous. We have carefully examined the record, and we disagree
 
 
 [10]
 We assume that the district court intended to prohibit the transfer of funds from a location inside the United States to a location outside the United States, although the paragraph could be read alternatively as prohibiting the transfer of funds located outside the United States. Resolving this ambiguity is not critical to our disposition of the present appeal, but the district court might wish to clarify its language in any order it might issue during future stages of the litigation
 
 
 [11]
 Defendants moved for a stay pending appeal. The district court denied the motion, but on May 30, 1989, this court stayed paragraphs 2, 3, 5 and 8 of the preliminary injunction. We also stayed paragraph 1 until plaintiffs post a bond and stayed paragraph 1 insofar as it applies to Blinder International. While retaining jurisdiction to hear this appeal, we remanded the matter to the district court for consideration of an appropriate bond amount. To our knowledge, the district court has taken no action on the matter since then
 
 
 [12]
 Although not a party to the district court action, Blinder International clearly meets the usual standing requirements to pursue this appeal. Asserting its own rights, Blinder International is seeking redress for concrete injury--loss of the uninhibited use of certain of its funds--fairly traceable to the imposition of the preliminary injunction. See, e.g., Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (summarizing standing requirements); Brown v. Board of Bar Examiners, 623 F.2d 605, 608 (9th Cir.1980) (dismissed party has standing to appeal injunction by which it is specifically bound)
 
 
 [13]
 Appellants assert further that whatever final relief plaintiffs might be entitled to is legal in nature, not equitable. If the district court lacked the power to issue a preliminary injunction to protect a potential future legal remedy, then this appeal could turn upon whether the final remedies plaintiffs are likely to obtain are legal or equitable in nature. However, because we conclude that a district court may issue a preliminary injunction to protect even a damages remedy, assuming that the usual requirements for obtaining equitable relief are met, we need not attempt to characterize plaintiffs' likely final remedies as legal or equitable in nature
 
 
 [14]
 Both sides assume that the district court's order is an "injunction" within the meaning of Fed.R.Civ.P. 65, which would therefore be governed by the federal common law that has developed around the All Writs Act and similar provisions. See infra note 15. Thus, we have no occasion to consider the circumstances, if any, under which purported "injunctions" are in fact "remedies providing for seizure of ... property for the purpose of securing satisfaction of the judgment ultimately to be entered," the availability of which is governed by the law of the state in which the district court sits. See Fed.R.Civ.P. 64
 We acknowledge that the Sixth and Ninth Circuits have strongly suggested that rule 65, as opposed to rule 64, governs if and only if the underlying action is equitable in nature, see USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94, 97 (6th Cir.1982); FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir.1982), which seems equivalent to saying that a preliminary injunction can never issue to protect a damages remedy. To that extent, we disagree.
 
 
 [15]
 Arguably, First National could be distinguished from De Beers in that First National involved the scope of equitable power under 26 U.S.C. Sec. 7402(a) (1982), which authorizes the district courts to grant injunctions "necessary or appropriate for the enforcement of the internal revenue laws." Absent more specific statutory provisions like section 7402, the district courts' equitable powers derive from the All Writs Act, 28 U.S.C. Sec. 1651(a), which authorizes federal courts to grant all writs "agreeable to the usages and principles of law" and which has been held neither to expand nor contract traditional equitable powers, see, e.g., De Beers, 325 U.S. at 219, 65 S.Ct. at 1133. Despite the different authorizing statutes at issue in the two cases, First National chose not to distinguish De Beers on this ground
 
 
 [16]
 This analysis is fully consistent with Fechter v. HMW Industries, Inc., 879 F.2d 1111 (3d Cir.1989). In Fechter, we "recognize[d] that as a general rule an injunction will not be issued in a money damages case prior to a determination of liability and an award of damages." Id. at 1119. Fechter, however, was simply restating the axiom that equitable remedies become available only if legal remedies are inadequate. "It is not so much that money cannot be the object of an injunction, but rather, under ordinary circumstances, if a recovery of money damages is available, equitable relief is unnecessary." Id. (emphasis added)
 
 
 [17]
 Concern about pre-judgment asset restraints and the public interest has been expressed most vociferously in other contexts. For example, the criminal RICO statute grants the district courts broad power to afford preliminary relief to the government in order to protect assets potentially subject, upon their owner's conviction, to the RICO forfeiture provisions. See 18 U.S.C. Sec. 1963(d). Responding to the perceived unfairness and potential for abuse in that provision, the Justice Department has issued prosecutorial guidelines designed to ensure that it is used as narrowly as possible consistent with the government's interest in preserving assets to which the government might become entitled. See 58 U.S.L.W. 2273 (1989)
 
 
 [18]
 The flaw we have identified in the district court's injunction is so general and pervasive that we will not attempt to sever acceptable paragraphs from unacceptable ones. It would be better to let the district court reformulate from scratch whatever injunction it deems appropriate in light of this opinion
 
 
 [19]
 Nondisclosures, as opposed to affirmative misrepresentations and misleading half-truths (i.e. failures to disclose sufficient information to render statements actually made not misleading), ordinarily are not actionable under section 12(2) or rule 10b-5. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988). However, appellants do not argue that Blinder, Robinson's nondisclosures are immunized qua nondisclosures. Thus, we may assume that Blinder, Robinson did have an affirmative duty to disclose material information
 
 
 [20]
 Unlike Blinder, Robinson's failure to disclose its markups and markdowns, its affirmative representation that certain stocks came recommended by its "research department"--coupled with its failure to disclose that that department consisted of exactly one individual, who performed no independent research and who only recommended stocks underwritten by Blinder, Robinson--falls squarely within the prohibition against asserting misleading half-truths. See supra note 19
 
 
 [21]
 Appellants point out that there is nothing inherently fraudulent in recruiting customers by means of a planned sequence of telephone calls. Moreover, they note certain respects in which Blinder, Robinson's scripted sequence is preferable to sequences used by other reputable securities firms. These points miss the mark, however, for the district court did not find the three-call sequence itself to be inherently misleading, but simply found that certain representations about the research department made during that sequence were misleading
 
 
 [22]
 As we discussed above, the value of the assets encumbered by a preliminary injunction must bear some reasonable relationship to the size of the likely final judgment it is designed to protect. That relationship need not be calibrated with mathematical exactitude, however. This is a case, like most class actions, in which the value of the named plaintiffs' claims is quite small in relation to the value of the claims of the class as a whole. This explains our conclusion regarding the legal irrelevance of arguments bearing only on whether the named plaintiffs are likely to succeed on the merits. On the other hand, arguments about why a distinct subset of the claims are unlikely to succeed on the merits would be relevant in determining the permissible scope of the preliminary injunction--i.e. how much money could be encumbered--if the subset were large enough that the soundness of the argument would materially decrease the expected value of the judgment
 One argument of this type might be constructed from appellants' suggestion, made in another context, that many of the otherwise promising class claims will be barred by a statute of limitations defense. Claims arising under either section 12(2) or rule 10b-5 cannot be filed more than three years after the alleged violation has occurred. See 15 U.S.C. Sec. 77m (section 12(2) claims); McCarter v. Mitcham, 883 F.2d 196, 201-05 (3d Cir.1989) (rule 10b-5 claims). In this case, the district court defined the class to include anyone who had purchased or sold certain securities through Blinder, Robinson between September 1, 1984 and December 31, 1986, even though none of the three actions was filed until at least January 13, 1988. Obviously, therefore, a substantial number of plaintiffs' securities claims will be time-barred, perhaps a substantial enough number to require the district court, should it seek to reimpose a preliminary injunction, to narrow that injunction from what it otherwise could have been.
 We note this example only to illustrate our point that success on the merits arguments in this context are relevant if and only if they implicate a sufficiently broad subset of the claims to materially alter the expected value of the judgment. Appellants raised the statute of limitations issue in the very different context of arguing that the need for individualized determinations of its statute of limitations defense helps show that the district court abused its discretion in certifying the class. For reasons explained below in Part IV, however, we conclude that we lack jurisdiction to address the class certification issue at this time.
 
 
 [23]
 Plaintiffs argue that a presumption of reliance was also appropriate under the fraud-on-the-market theory recognized in Peil v. Speiser, 806 F.2d 1154 (3d Cir.1986), and Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). We have expressly reserved the question whether that theory applies in the context of the over-the-counter markets in which Blinder, Robinson conducted business. See Peil, 806 F.2d at 1161 n. 10. Given our analysis in the text, we have no occasion to resolve the question at this juncture
 
 
 [24]
 As noted above, the notion of detrimental reliance in the rule 10b-5 context is simply an application of the law's ubiquitous causation-in-fact requirement. See Basic, 108 S.Ct. at 989. Rule 10b-5 also contains the equivalent of a proximate causation requirement. Thus, a plaintiff who detrimentally relies on a material misrepresentation cannot recover if the relationship between the misrepresentation and a resulting purchase or sale of securities is too attenuated to say that the misrepresentation occurred "in connection with," 15 U.S.C. Sec. 78j, the purchase or sale. See, e.g., Ketchum v. Green, 557 F.2d 1022, 1025-29 (3d Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). To the extent appellants contend that Blinder, Robinson's allegedly fraudulent conduct did not occur "in connection with" the purchase and sale of securities, that contention is frivolous
 
 
 [25]
 A defrauded seller has no cause of action under section 12(2). A defrauded buyer is entitled to rescission under section 12(2), if the defendant seller still owns the stock, or a rescissionary measure of damages otherwise. See Randall v. Loftsgaarden, 478 U.S. 647, 655-56, 106 S.Ct. 3143, 3148-49, 92 L.Ed.2d 525 (1986). Under rule 10b-5, in contrast, a defrauded seller is entitled to the greater of (1) the difference between the price he actually received for his stock and the price he would have received for his stock absent the fraud (i.e. his out-of-pocket loss) or (2) the difference between the price at which he sold his stock and the amount realized by the defendant buyer on resale (i.e. a disgorgement or restitutionary measure). See Affiliated Ute Citizens v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972). Ordinarily, a defrauded buyer is entitled to out-of-pocket damages under rule 10b-5. See Randall, 478 U.S. at 662, 106 S.Ct. at 3152. Although the Supreme Court has reserved the question whether a rescissionary measure of damages is ever appropriate for defrauded buyers under rule 10b-5, see id., this court has expressed clear disapproval of a damage theory that would insure defrauded buyers against downside market risk unrelated to the fraud, see Sharp v. Coopers & Lybrand, 649 F.2d 175, 190 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982), which is exactly what a rescissionary measure is designed to accomplish
 Assuming that this tentative summary of the generally checkered area of damages under the securities laws would apply in this case, it is apparent that the availability of section 12(2) as an alternative theory of recovery could, on certain facts, substantially increase the value of plaintiffs' expected judgment. For example, imagine a plaintiff who transacts a purchase and resale of stock with Blinder, Robinson in the aftermarket during the class period. Plaintiff pays 100 for stock that he could have bought for 95 absent fraud; later, plaintiff sells at 20 when he could have sold for 25 absent fraud; finally, Blinder, Robinson realizes no profit on resale. Under the rules sketched above, plaintiff's expected damages under rule 10b-5 would be (100 - 95) + (25 - 20) = 10. However, if section 12(2) also covered plaintiff's aftermarket purchase, he could recover rescissionary damages of 100 - 20 = 80, abstracting away interest (which would increase the expected recovery) and assuming that plaintiff received no dividends on the stock (which would decrease his expected recovery dollar for dollar). In other words, if the magnitude of a general decline in the market for penny stocks during the class period greatly exceeded the magnitude of Blinder, Robinson's various alleged frauds, the availability of section 12(2) for plaintiffs' aftermarket purchases would materially increase the class's aggregate expected recovery.
 
 
 [26]
 A "pattern" of racketeering activity involves two acts of racketeering committed within ten years of one another. See 18 U.S.C. Sec. 1961(5). "Racketeering activity" includes acts of securities fraud. See id. Sec. 1961(1). There is no dispute here that the predicate acts alleged meet the "continuity plus relationship" requirement, see H.J. Inc. v. Northwestern Bell Tel. Co., --- U.S. ----, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989), necessary to establish a RICO pattern
 
 
 [27]
 Alternatively, plaintiffs define the RICO "enterprise" as an association in fact among Blinder, Robinson; Meyer Blinder; and other persons
 
 
 [28]
 Section 1962(c) provides, in pertinent part:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to ... participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity.
 
 
 [29]
 In their reply brief, appellants raise two distinct arguments why plaintiffs are unlikely to succeed on the merits of their RICO claims. First, appellants argue that plaintiffs are unlikely to succeed on their claims under section 1962(a) because under this court's decision in Rose v. Bartle, 871 F.2d 331, 357-58 (3d Cir.1989), a plaintiff must show injury not only from the predicate racketeering acts (as the district court evidently thought), but also from the defendant's investment of the proceeds of those acts in the RICO "enterprise." Second, appellants argue that the RICO conspiracy claims, see 18 U.S.C. Sec. 1962(d), are unlikely to succeed because Meyer Blinder, an employee of Blinder, Robinson, cannot, as a matter of law, conspire with his employer. Compare, e.g., McLendon v. Continental Group, Inc., 602 F.Supp. 1492, 1511-12 (D.N.J.1985) (section 1964(d) does not reach conspiracies between an employer and employee) with, e.g., Callan v. State Chem. Mfg. Co., 584 F.Supp. 619, 623 (E.D.Pa.1984) (section 1964(d) does reach conspiracies between an employer and employee)
 As a general matter, the courts of appeals will not consider arguments raised on appeal for the first time in a reply brief. See, e.g., Wright v. Holbrook, 794 F.2d 1152, 1156 (6th Cir.1986) (collecting cases). Because Rose was decided over three months before appellants filed their brief in this court, we see no exceptional circumstances to justify deviating from the general rule in this case. Appellants may, if necessary, present these arguments to the district court on remand, at a time when appellees will have fair opportunity to respond to them.
 
 
 [30]
 Feit & Drexler and Roland clearly envision situations in which a preliminary injunction may issue to protect a potential final judgment that is legal in nature--the holding of Teradyne. To that extent, they provide further support for the narrow reading of De Beers endorsed above in Part II. Foltz is more equivocal on this point, for the underlying claim in that case, an action under section 502(a)(1)(B) of ERISA, was equitable in nature, see Pane v. RCA Corp., 868 F.2d 631, 636 (3d Cir.1989), even though it sought a monetary recovery
 
 
 [31]
 Plaintiffs too derive some protection from the bond requirement, for defendants injured by wrongfully issued preliminary injunctions can recover only against the bond itself. See W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2185 n. 14, 76 L.Ed.2d 298 (1983)
 
 
 [32]
 Commentators have suggested excusing the bond requirement "when plaintiff is indigent or is suing in the public interest." See Note, Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c), 99 Harv.L.Rev. 828, 833 (1986). We believe that these exceptions, if they are to be drawn at all, should be drawn narrowly. In this case, we need not determine whether recognizing either of them is ever appropriate. This record contains no evidence that the plaintiffs are indigent. Moreover, we believe that suits brought to recover money lost speculating in penny stocks are not so overwhelmingly suffused with the public interest as to justify the judicial rewriting of rule 65(c)