**LOCAL 397, INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND FURNITURE WORKERS, AFL–CIO, Plaintiff,**

v.

**MIDWEST FASTENERS, INC., d/b/a, Erico Fastening Systems, et al., Defendants.**

Civ. No. 90–4114 (CSF).

United States District Court,
D. New Jersey.

Nov. 14, 1990.

Theodore M. Lieverman, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for plaintiff.

Steven W. Suflas, Archer & Greiner, Haddonfield, N.J., for defendants.

OPINION

CLARKSON S. FISHER, District Judge.

Before the court is a motion by plaintiff for a preliminary injunction under rule 65 of the Federal Rules of Civil Procedure. Plaintiff seeks to preliminarily enjoin defendants from dissipating assets or money that would be needed to satisfy a final judgment in plaintiff's action against defendants under the Worker Adjustment and Retraining Notification Act of 1988 ("WARN" or the "Act"), 29 U.S.C.A. §§ 2101–2109 (West Supp.1990). For the reasons that follow, the court will deny this motion.

## I. FINDINGS OF FACT

Plaintiff ("Local 397" or the "union") was the exclusive bargaining agent for all production and maintenance employees at the Moorestown, New Jersey, plant of defendant Midwest Fasteners, Inc., doing business as Erico Fastening Systems ("EFS"). Local 397 is a labor organization and a "representative" within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(5), and it is a "representative"

within the meaning of WARN, 29 U.S.C. § 2101(a)(4).

EFS is engaged in the manufacture and sale of stud welding fasteners and equipment. EFS has its primary facility in Moorestown, New Jersey. It also has a small manufacturing facility in Houston and warehouse facilities in Boston, Chicago, San Francisco and Los Angeles. EFS is a wholly-owned subsidiary of defendant Erico International Corp. ("International"). Employing over 100 employees, EFS is an employer within the meaning of the Act. 29 U.S.C. § 2104(a)(1).

International is a wholly-owned subsidiary of defendant Erico Investment Inc. ("Investment").

Local 397 and EFS entered a collective bargaining agreement on July 1, 1989, expiring June 30, 1992.

During the calendar year 1987, EFS sustained a book loss of approximately $5,000,-000. For calendar year 1988, EFS broke even, but its overall fiscal health remained precarious. During calendar year 1989, EFS suffered a book loss of over $3,100,-000, requiring International to provide EFS with intercompany loans totalling $1,900,-000.

Since 1987, AmeriTrust Company National Association ("AmeriTrust") has held a security interest in all of EFS's assets other than real property to secure an asset-based credit agreement of approximately $6,000,000. AmeriTrust is a secured lender to International, providing it with a revolving line of credit. AmeriTrust is also a lender to Investment.

During the latter part of 1989, AmeriTrust informed EFS that it was dissatisfied with its continuing losses and advised Investment that "a decision must be made" regarding EFS.

During the first five months of 1990, International funnelled approximately $2,000,000 to EFS through intercompany loans to counter EFS's continuing operational losses.

In early 1990, AmeriTrust threatened to reduce EFS's loan by $650,000 and to lower advance rates. EFS was able to convince AmeriTrust to postpone any action until May 1, then to June 30, and finally to August 24, 1990. EFS was not able to extend the deadline any further.

By the spring of 1990, EFS, International and Investment had exhausted their sources of credit from AmeriTrust.

In the late winter and spring of 1990, EFS contacted a number of lenders, including Citicorp, Manufacturers Hanover, National City Bank, Prudential and others in an attempt to refinance EFS's debt. All talks terminated in May of 1990.

As early as February 1990, EFS initiated efforts to sell its Moorestown facility. EFS contacted ESAB, Nelson Stud Welding, Betterman, Cromp Arc and Rostra. The three expressing the most interest in EFS were Nelson, ESAB and Rostra. On August 3, 1990, Nelson informed EFS that it would not acquire EFS.

In a letter to EFS dated May 15, 1990, Rostra indicated that it would prefer to keep all discussions of a possible sale "on a strictly confidential basis." On August 10, 1990, Rostra notified EFS that it would not purchase EFS.

On August 24, 1990, ESAB notified EFS that it would not acquire EFS.

On August 24, 1990, the Board of Directors of International decided that EFS should be closed immediately. That decision was communicated to the general manager of EFS's Moorestown facility, Jeffrey Church.

On July 20, 1990, EFS laid off five employees. On August 14, 1990, EFS laid off another 21 employees.

On August 27, 1990, EFS closed its Moorestown plant. The closing of the plant was effective immediately, terminating all employees. EFS had given no prior notice of the closing to Local 397 or the employees.

As of the date of the closing of the plant, there were approximately 135 employees covered by the collective bargaining agreement between Local 397 and EFS (excluding the 26 who had been laid off within the five weeks prior to the closing).

On August 27, 1990, Jeffrey Church announced that the closing of the plant and the termination of all employees were due to "the financial situation" at the company.

On August 28, 1990, representatives of the union met with EFS representatives to discuss employee benefits in connection with the closing. At that meeting, EFS indicated that it would need 26 employees to complete work already in progress.

On August 29, 1990, EFS rehired 26 bargaining unit employees to continue to perform production, maintenance and shipping duties.

On September 28, 1990, EFS terminated 13 of the 26 recalled employees. On October 5, 1990, EFS released another two. As of October 12, 1990, eleven employees remained.

As of October 12, 1990, EFS had nearly 400 creditors, secured and unsecured, with claims totalling approximately $1,700,000.

As of October 12, 1990, EFS was in the process of completing work in progress, paying its present employees, and attempting to bring about an orderly liquidation of its assets.

On October 9, 1990, Local 397 brought this action on behalf of the union-eligible employees of EFS under section 2104(a)(5) of WARN. On that date, the court entered a temporary restraining order. On October 10, 1990, the parties agreed to a modified temporary restraining order, with the consent of the court. The union now seeks a preliminary injunction under rule 65 of the Federal Rules of Civil Procedure to ensure the satisfaction of a potential future judgment in its WARN action.

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction*

"Rule 65 concerns the procedure for issuing a preliminary injunction. The substantive basis and the jurisdictional authority for use of this procedure must be sought elsewhere." *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1109 (9th Cir.1982).

The court has jurisdiction over this action under the Act, 29 U.S.C. § 2104(a)(5), as well as under 28 U.S.C. §§ 1331, 1337.

### B. *Exclusivity of Remedies under WARN*

■ Defendants argue that, by virtue of the exclusivity of remedies clause in WARN, this court is without authority to issue a preliminary injunction.

The Act provides:

The remedies provided for in this section shall be the exclusive remedies for any violation of this chapter. Under this chapter, a Federal court shall not have authority to enjoin a plant closing or mass layoffs.

29 U.S.C. § 2104(b). In this Act, Congress did not specifically prohibit a court from enjoining a potential future damages award. Consequently, Congress did not intend to deprive a court of the equity power granted it under the All Writs Act, 28 U.S.C. § 1651(a).

Under the All Writs Act, federal courts have the power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). In *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 19–20, 94 S.Ct. 1028, 1038–39, 39 L.Ed.2d 123 (1974), the Supreme Court noted that if Congress intended to deprive a court of equitable powers, it would specifically limit the equitable jurisdiction vested in the district court. *See also FTC v. Dean Foods Co.*, 384 U.S. 597, 608, 609–10, 86 S.Ct. 1738, 1744, 1745–46, 16 L.Ed.2d 802 (1966) (Congress must express intent to circumscribe traditional judicial remedies).

In WARN, Congress has expressly restricted the power of a federal court to enjoin a plant closing or a mass layoff. 29 U.S.C. § 2104(b). However, Congress has not specifically restricted the power of a federal court to issue a preliminary injunction to protect a future damages award. Therefore, Congress has expressed its intent to limit the power to enjoin only in certain instances. This court will not infer from Congress's silence an intent to re-

strict any other particular exercise of power by federal courts.

## C. *Writ of Attachment*

EFS argues that the union, by seeking a preliminary injunction under rule 65 of the Federal Rules of Civil Procedure, has sought relief unavailable to it. Because Local 397 requests a seizure of assets, EFS argues, rule 64, which concerns the issuance of a writ of attachment, should control this action.

■■■ However, in *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir.1990), the Third Circuit determined that a district court may issue a preliminary injunction to protect a potential future damages remedy, provided that the plaintiff demonstrated that the traditional requirements for obtaining equitable relief had been met.

Consequently, the court has the power to issue a preliminary injunction and the union need not request the relief of a writ of attachment under rule 64. But in order to obtain the injunction, plaintiff must show that it is likely to become entitled to encumbered funds upon final judgment. *Id.* Plaintiff must also demonstrate that without the preliminary injunction, it will probably be unable to recover those funds. *Id.* In addition, the court must consider the possibility of harm to other interested persons from the grant or denial of the preliminary injunction and the public interest. *Id.* at 198.

## D. *Likelihood of Success on the Merits*

In order to obtain a preliminary injunction, Local 397 must show that it is likely to prevail in its action against EFS under WARN. The union argues that it is likely that the court will find EFS liable for its failure to provide notice of a plant closing within the statutory period.

Under the Act,

An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—

(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee. . . .

29 U.S.C. § 2102(a). On August 27, 1990, EFS's manufacturing operations in Moorestown underwent a "plant closing" within the meaning of the Act. *Id.* § 2101(a)(2).

However, EFS contends that an exemption provision in the Act relieved it of its obligation to meet the notification requirement. This exemption provides:

An employer may order the shutdown of a single site of employment before the conclusion of the 60–day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

*Id.* § 2102(b)(1). This exemption is known as the "faltering company" exception. *See* 134 Cong.Rec. S8693.

In WARN, Congress vested the Secretary of Labor with the authority to prescribe regulations "as may be necessary to carry out this chapter." 29 U.S.C. § 2107(a). The Secretary has determined that, in order to fall within this exception, the "faltering company" must prove that it meets four conditions. 20 C.F.R. § 639.9 (1990). First, at the time that the 60–day notice would have been required, which would have been June 28, 1990, EFS must have been seeking financing or refinancing or must have been seeking additional money, creditor business through any other commercially reasonable method. *See id.* § 639.9(a)(1). To satisfy this condition, EFS must be able to point to specific actions taken at that time to obtain capital or business.

EFS must then prove that a realistic opportunity to obtain the financing or business sought existed then. *Id.* § 639.9(a)(2).

Thirdly, EFS must show that the financing or business sought would have been

sufficient to have enabled it to avoid or postpone the shutdown and to keep the facility open for a reasonable period of time. *Id.* § 639.9(a)(3).

Finally, the fourth condition requires EFS to establish that it reasonably and in good faith believed that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given. *Id.* § 639.9(a)(4).

This court finds that it is likely that EFS will not be able to carry this burden because EFS will be unable to meet the first condition.

Before enacting WARN, Congress presented a conference report in order to "provide[ ] guidance that [would] enable employers to better understand Congress' intent in adopting this legislation and [would] facilitate compliance with the law." 134 Cong.Rec. S8686. In this report, Congress found it necessary to "clarify" the meaning of its exception to the notification requirement:

> FALTERING COMPANY. The provision would permit, under specifically defined circumstances, an employer to shut down one or more sites of employment without providing the full notice required by the bill. The defense is intended as a narrow one applicable only where it was unclear 60 days before the closing whether the closing would occur; the employer was actively pursuing measures that would avoid or indefinitely postpone the closing; and the employer reasonably believed both that it had a realistic opportunity of obtaining the necessary capital or business and that giving notice would prevent the employer's actions from succeeding.

The key phrases are first that the employer was "actively seeking capital or business"; second that, had the employer obtained this capital or business, it "would have enabled the employer" to prevent or forestall the shutdown; and third, that the employer "reasonably and in good faith believed" that giving the notice required would have precluded the employer from obtaining the necessary capital or business that it had a realistic opportunity to obtain. Thus, to avail itself of this defense an employer must prove the specific steps it had taken, at or shortly before the time notice would have been required, *to obtain a loan, to issue bonds or stock, or to secure new business.* This duty to seek capital or business falls on the employer, not the single site alone, and assumes that the employer lacks the necessary capital or business. Moreover, the employer must show the reasonable basis for its good-faith belief that giving the required notice would have prevented the employer from obtaining the capital or business that the employer had a realistic opportunity to obtain. Finally, the employer also must show that, upon learning that the workplace would be closed, it promptly notified the employees and explained why earlier notice had not been given. *Id.* S8693 (emphasis added).

■ The ultimate issue of the trial on the merits will be whether coordinating a sale of the facility qualifies as "actively seeking capital or business." *Id.* This court finds that such an activity does not qualify. If Congress intended a sale to fall within this exception, it would have expressed such an intent. Instead, Congress restricted what it specifically referred to as a "narrow" exception to the activities of seeking capital, such as obtaining loans, issuing bonds or stock, or the activity of securing new business.

There is further evidence that Congress did not intend this narrow exception to apply to the sale of a plant. In the Act itself, Congress specifically addressed the allocation of the burden of providing notice when a sale of the business occurs. 29 U.S.C. § 2101(b)(1). This compels the conclusion that Congress did not overlook the possibility that a sale might affect a plant closing.

Consequently, Congress did not intend a sale to relieve an employer from its obligation to notify its employees. Therefore, EFS can only come within the exception if it demonstrates that it was actively seeking capital or business as of June 27, 1990.

However, EFS ceased all attempts to secure a new loan in May of 1990 and was attempting to find a purchaser for the business as of late June. Consequently, this court finds that EFS is unlikely to fall within the "faltering company" exception and the union is likely to prevail.

### E. *Inability to Recover the Funds*

■ In order to obtain the relief requested, Local 397 cannot rest on a demonstration of a likelihood of success on the merits. It must also demonstrate "'a clear showing of immediate irreparable injury.'" *Hoxworth,* 903 F.2d at 205 (quoting *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 225 (3d Cir.1987)).

The union contends that if it obtains a judgment against EFS for the violation of WARN, EFS may be unable to satisfy it. In *Hoxworth,* the court determined that the future inability to satisfy a money judgment can constitute irreparable harm. *Id.* at 206.

However, Local 397 has not sustained its burden of proving that it will be unable to recover these funds from EFS. There has been no demonstration that EFS is attempting to transfer money to a third party in order to avoid liability to Local 397. *See, e.g., Deckert v. Independent Shares Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940) (where seller of securities alleged to be insolvent deposited money belonging to alleged defrauded buyers of securities in trust controlled by third party, preliminary injunction preventing third party from transferring assets of seller justified).

Furthermore, there is no indication that EFS has been attempting to consume, dissipate or fraudulently convey the assets in an attempt to move the assets beyond the reach of this court. *See Hoxworth,* 903 F.2d at 206. On the contrary, EFS has been completing work in progress, paying its present employees, and adhering to its plan to effect an orderly liquidation and reduce its debt.

As a consequence, Local 397 has been unable to demonstrate the immediate, irreparable injury necessary to justify relief before trial.

### F. *Possibility of Harm to Others and the Public Interest*

When deciding whether to issue a preliminary injunction, the court must consider whether others might be harmed and whether such an action is in the public interest.

Whether the interests of groups harmed by the injunction ... should be compromised in order to protect the interests of the plaintiff ... depends on the strength of the latter's claims as potential judgment creditors and on the possibility for protecting their interests adequately without resorting to the relatively drastic measure of affording relief before trial.

*Hoxworth,* 903 F.2d at 208.

■ Although the union is likely to become a judgment creditor, there are nearly 400 other creditors, secured and unsecured, that stand to be hurt by an injunction freezing a majority of EFS's assets. The claims of these creditors total nearly $1,700,000. The interests of existing creditors will be harmed if they are subordinated to those of a potential creditor. In light of commercial practices and expectations, it makes little sense for this court to subordinate the claim of a creditor, especially a secured creditor, to that of a potential judgment creditor unless such a drastic measure is demonstrated to be absolutely necessary. That simply is not the case here.

Further, bargaining unit employees presently working for EFS, eight of whom may work for EFS for the next six months, will also be harmed by an injunction. An asset freeze of this nature will restrict EFS's ability to pay these workers. It will also limit EFS's ability to complete work in progress, to conduct its daily operations and to continue with its plan of an orderly liquidation.

For these reasons, the court finds that the possibility of harm to others and the public interest weigh against issuing a preliminary injunction at this time to ensure

the satisfaction of a potential damages award.

### G. *Conclusion*

 Although the court has the power to issue a preliminary injunction in this matter, it does not find that such a drastic remedy is warranted under the facts of this case. Because Local 397 cannot demonstrate that EFS will be unable to satisfy the potential damage award, and because the public interest requires that the assets be made available to other creditors at the present time, the court will deny the request for a preliminary injunction.