In re KRYPTON BROADCASTING OF FT. PIERCE, INC., Debtor.

In re KRYPTON BROADCASTING OF JACKSONVILLE, INC., Debtor.

Bankruptcy Nos. 93–31533–BKC– RAM, 93–31536–BKC–RAM.

United States Bankruptcy Court, S.D. Florida.

May 3, 1995.

---

Charles W. Throckmorton, Kozyak, Tropin & Throckmorton, P.A., Miami, FL, for Program Distributors.

C.J. Keith, Gustafson & Tilton, P.A., Fort Lauderdale, FL, for Feltner.

H. Scott Hecker, Ft. Lauderdale, FL, for Feltner.

### MEMORANDUM OPINION

ROBERT A. MARK, Bankruptcy Judge.

The Court conducted an evidentiary hearing on April 10, 1995, on the Motion for Sanctions against C. Elvin Feltner ("Feltner") filed by Warner Bros. Domestic Television Distribution, a division of Time Warner Entertainment Company, L.P.; MCA Televi-

sion Limited; Paramount Pictures Corporation; Columbia Pictures Television, Inc.; Jim Victory Television, Inc.; Twentieth Century Fox Film Corporation; Metro–Goldwyn–Mayer, Inc.; Viacom International, Inc.; and MTM Enterprises (collectively the "Program Distributors"). The evidentiary hearing was consolidated with a trial on the Program Distributors' Complaint seeking injunctive relief against Feltner in Adversary Proceeding 94–1314–BKC–RAM–A.

Both the Motions for Sanctions and the Complaint arise from papers filed by Feltner with the Federal Communications commission ("FCC"). In these papers, Feltner urges the FCC to deny applications filed by these Chapter 11 debtors (the "Debtors") for approval to transfer their broadcast licenses to buyers who acquired the Debtors' assets in auction sales conducted in this Court. Approval of the sales was incorporated in this Court's October 20, 1994 order confirming the Chapter 11 plan in these cases (the "Confirmation Order"). The Complaint seeks to enjoin Feltner, the Debtors' sole director and beneficial owner, from pursuing his FCC objections to the transfer of the licenses. The Motion for Sanctions seeks an order holding Feltner in contempt for allegedly violating the Confirmation Order, which required him to support approval of the FCC applications.

After reviewing the record, including the exhibits and testimony at trial, and after consideration of applicable law, the Court concludes that the Program Distributors have failed to establish the elements necessary to support injunctive relief. In particular, plaintiffs did not prove that they would be irreparably damaged in the absence of an injunction. However, Plaintiffs did prove by clear and convincing evidence that Feltner has willfully violated the Confirmation Order by actions constituting a civil contempt. Therefore, the Motion for Sanctions will be granted.

This Memorandum Opinion sets forth the findings and conclusions in support of these rulings.

### FACTUAL BACKGROUND

Krypton Broadcasting of Ft. Pierce, Inc., is a Delaware corporation with its principal place of business in Ft. Pierce, Florida. It owns and operates a commercial television station under license from the FCC identified by the call letters "WTVX." Krypton Broadcasting of Jacksonville, Inc., is a Delaware corporation with its principal place of business in Jacksonville, Florida. It owns and operates a commercial television station under license from the FCC identified by the call letters "WNFT." An involuntary bankruptcy petition was filed against both Krypton Broadcasting of Ft. Pierce, Inc., and Krypton Broadcasting of Jacksonville, Inc., on May 7, 1993. Both Debtors agreed to the entry of an Order for Relief.

Feltner is the sole shareholder of Krypton International Corp. ("KIC"). KIC is the sole shareholder of Krypton Broadcasting Corp. ("KBC"), the parent company of the Debtors in these jointly administered cases. Feltner is the sole director of the Debtors. The Program Distributors hold over ninety (90%) percent of the unsecured claims filed in these Chapter 11 cases. Trial Exhibits 20 through 42 (hereafter, "Ex. ____").

On October 13, 1993, Internationale Nederlanden (U.S.) Capital Corporation ("INCC"), the Program Distributors and Feltner, as Chairman of the Debtors, KIC and KBC, executed a stipulation which gave authority to the Program Distributors and INCC to solicit bids for the Debtors' assets. The stipulation also provided that the Debtors would take whatever actions might become reasonably necessary to effect the transfer of their respective FCC licenses if the television stations owned by the Debtors were sold (Ex. 4). INCC is the holder of the largest secured claim against the Debtors.

On March 7, 1994, INCC, the Debtors, Feltner, KIC and KBC entered into a Stipulation and Agreement (the "INCC Settlement Agreement"). The INCC Settlement Agreement provided that INCC and the Krypton Parties (as such term is defined in the INCC Settlement Agreement) would work together in good faith to prepare and file a plan of reorganization that would provide for a sale of the Debtors' television stations. The INCC Settlement Agreement also provided for the compromise and settle-

ment of the claims asserted by INCC against the Debtors.

The INCC Settlement Agreement provided Feltner and the other Krypton Parties with the opportunity to preempt a sale of the stations if they obtained not less than $24 million in cash to fund a plan of reorganization incorporating the terms described in the agreement. The deadline for Feltner to obtain the financing commitment was extended by later agreement, but neither Feltner nor any of the other Krypton Parties obtained the necessary financing.

Feltner and the Krypton Parties agreed that if they failed to obtain the financing necessary to reorganize and keep the stations, they would support an auction sale of the stations and support any plan filed by INCC to implement the sale.[1]

The stations were actively marketed and on October 3, 1994, the Court conducted an auction sale to select the highest and best bids. Feltner and the Krypton Parties had the right to bid at the sale but chose not to do so. Instead, on the day of the auction, Feltner caused the Debtors to file a motion seeking leave to file and pursue a competing plan of reorganization that would provide for an internal reorganization of the Debtors through outside financing ("Motion for Leave"). The Motion for Leave was in direct violation of the INCC Settlement Agreement which obligated the Debtors to support the auction sale and INCC plan.

On October 11, 1994, the Court conducted a confirmation hearing on the INCC plan of reorganization (the "Plan"), which provided for and implemented the sale of the stations. At the confirmation hearing, the Debtors, at Feltner's direction, opposed confirmation and argued that their Motion for Leave should be granted to allow them to prosecute a competing plan. The Court confirmed the plan over the Debtors' objections and denied the Debtors' request to proceed with their "internal" plan.

On October 20, 1994, this Court entered the Confirmation Order confirming the INCC Plan, more fully titled "Order (A) Confirming First Amended Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code and (B) Approving the Sales of Certain Estate Assets." The Confirmation Order is final, and no appeals were taken.

The Confirmation Order approved the sales of the Debtors' assets to the respective successful bidders at the October 3rd auction. The successful bidder for the assets of Debtor Krypton Broadcasting of Ft. Pierce, Inc. was Whitehead Media, Inc., with a bid of $17.175 million. The successful bidder for the assets of Debtor Krypton Broadcasting of Jacksonville, Inc. was RDS Broadcasting, Inc., with a bid of $10 million.

The sale of the Debtors' television station assets includes the transfer of their broadcast licenses, which transfers are subject to approval by the FCC. Applications for the transfer of the broadcast licenses (the "FCC Applications") are presently pending before the FCC for approval. Since FCC approval is required to consummate the sales and implement the Plan, the plan proponents requested language in the Confirmation Order requiring the Debtors and their officers and directors to cooperate in filing the FCC Applications and to support their approval. This requirement is contained in paragraph II.A.3 of the Confirmation Order which provides as follows:

> The Debtors and the Plan Trustee are hereby authorized, empowered, and directed to execute, deliver, file, record, or otherwise perform all things necessary to effectuate this Order and to consummate the

---

1. Paragraph 3 of the INCC Settlement Agreement provides as follows:

    If the Krypton Parties have failed to obtain the Plan Funding Commitment prior to April 30, 1994, the Krypton Parties shall not, and do hereby waive and release any right they may have to object to or oppose (a) approval of the Auction Motion (b) any plan or plans filed by INCC with respect to KBFP and KBJ, (c) the sale of KBFP and KBJ (or their assets) to the

successful bidder under the auction process implemented pursuant to the Action Motion, or (d) any motion filed by INCC for relief from the automatic stay. The Krypton Parties shall have the right to participate in any auction implemented pursuant to the Auction Motion; *provided*, that the Krypton parties shall be subject to the same requirements and standards applicable to all other bidders participating in such auction.

transactions contemplated by the Ft. Pierce Asset Purchase Agreement and the Jacksonville Asset Purchase Agreement, including, without limitation, the execution of applications to transfer the FCC licenses held by each of the Debtors (the "FCC Applications"). The Debtors *and the officers and directors of the Debtors existing prior to the Effective Date,* and the officers and directors of the Reorganized Debtors, as may be necessary, are directed (x) to sign the FCC Applications, as appropriate, within the later of (a) ten (10) days after the entry of this Order, and (b) the submission of a completed FCC Application by the Ft. Pierce successful bidder or the Jacksonville successful bidder, as the case may be, to such person, and (y) to supplement, as necessary, and *support approval of, the FCC Applications.*

(Ex. 1, p. 17) (emphasis added).

Feltner, as director of the Debtors prior to the effective date, is bound by this specific provision of the Confirmation Order.

After the Debtors, acting through an authorized officer, executed and filed the FCC Applications, Feltner took action seeking to defeat rather than support the FCC Applications. First, on December 30, 1994, Feltner filed with the FCC a "Petition to Deny Application for Transfer of Control of Television Station WNFT–TV, Jacksonville, Florida." (Ex. 5) and a "Petition to Deny Application to Transfer of Control of Television Station WTVX–TV, Ft. Pierce, Florida." (Ex. 6).

Then, on February 23, 1995, Feltner, through counsel, filed with the FCC an Informal Objection to the application for assignment of the license of WNFT–TV from Krypton Broadcasting of Jacksonville, Inc., to RDS Broadcasting, Inc. Four days later, on February 27, 1995, Feltner, through counsel, filed with the FCC an Informal Objection to the application for assignment of the license of WTVX–TV from Krypton Broadcasting of Fort Pierce, Inc., to Whitehead Media, Inc.

### PROCEDURAL BACKGROUND

Based upon news reports quoting Feltner's intent to file protests with the FCC (Ex. 9), the Program Distributors filed their Complaint for Injunctive Relief on December 29, 1994, together with their Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction Enjoining Interference with Sale of Debtor's Assets ("Motion for Preliminary Injunction").

The Court conducted an evidentiary hearing on the Motion for Preliminary Injunction on January 10, 1995. A transcript of that hearing was introduced at trial (Ex. 11). At the conclusion of the hearing, the Court announced its ruling denying the Motion for Preliminary Injunction finding that "the Plaintiffs have failed to meet their burden of proving the likelihood of suffering irreparable injury if the injunction does not issue" (Ex. 11, p. 118). Plaintiffs established that Feltner's actions could delay the approval process and place the sales contracts at risk. However, Plaintiffs failed to prove that the buyers would refuse to extend the closing dates or that a resale of the stations, even if required, would yield less money.

Although it denied preliminary injunctive relief, the Court commented that "there's a prima facie case that the objections that Mr. Feltner has filed with the FCC constitute at least in part an impermissible collateral attack on what's been accomplished in the bankruptcy case" (Ex. 11, p. 116). The Court added that in denying preliminary injunctive relief, "the Court is not condoning the conduct of Mr. Feltner [which] may give rise ... to proceedings to consider contempt" (Ex. 11, p. 117).

The Court's January 11, 1995 Order Denying Motion for Preliminary Injunction specifically referenced the possibility of other relief arising from Mr. Feltner's conduct, stating that:

Denial of the motion for preliminary injunction is without prejudice to other relief plaintiffs may seek against the defendant arising from alleged violations of prior court orders including but not limited to the Confirmation Order.

January 11, 1995 Order Denying Motion for Preliminary Injunction, p. 2.

On February 21, 1995, the Program Distributors filed their Motion for Sanctions alleging that Feltner's actions in petitioning the FCC to deny approval of the license

transfers constituted a willful, clear and direct violation of the Confirmation Order. The Court consolidated the evidentiary hearing on the Motion for Sanctions with the trial on the Program Distributors' Complaint for Injunctive Relief.

## DISCUSSION

### A. The Program Distributors Failed to Prove Their Entitlement to Injunctive Relief

█ The Program Distributors sought to prove that Feltner's actions could delay the FCC approval process and cause irreparable harm to them as creditors of these estates. In attempting to satisfy the requirements for injunctive relief at trial, the Program Distributors relied almost exclusively on the evidence presented at the January 10, 1995 preliminary injunction hearing. They also introduced certified copies of money judgments of record against Feltner in excess of $17,000,000 to prove that a judgment for damages against Feltner for violating the Confirmation Order would be meaningless, citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 205 (3rd Cir.1990) (possibility of an unsatisfied money judgment may constitute irreparable injury in injunction action).

This additional evidence and legal argument did not remedy the shortcomings in Plaintiffs' request for injunctive relief. There is simply no evidence that the purchase contracts will be terminated if approval is delayed nor any evidence that less money will be realized to pay the Plaintiffs' bankruptcy claims even if the stations have to be resold to other purchasers. Although the Plaintiffs may lack an adequate remedy at law if they are left with possible money damages as their only remedy against Feltner, there is no evidence of the extent or likelihood of losses that Plaintiffs will suffer because of Feltner's wrongful conduct. Thus, Plaintiffs have not proven their case for injunctive relief and judgment will be entered for defendant Feltner on the Complaint.

### B. Feltner's Conduct Constitutes Willful Contempt of the Confirmation Order

█ A party seeking a civil contempt order must prove by clear and convincing evidence that another party has violated a court order. *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992); *In re Sun–Island Realty, Inc.*, 177 B.R. 391, 395 (S.D.Fla.1994); *In re Spanish River Plaza Realty Co.*, 155 B.R. 249, 253 (Bankr.S.D.Fla.1993).

█ Civil contempt powers are expressly granted to the bankruptcy court by 11 U.S.C. § 105, which authorizes the court to take any action "necessary or appropriate to enforce or implement court orders..." *Spanish River*, 155 B.R. at 251; *In re Duggan*, 133 B.R. 671 (Bankr.D.Mass.1991). A confirmation hearing and confirmation order are core matters under 28 U.S.C. § 157(b)(2)(A), (L). Civil contempt proceedings arising out of core matters are themselves core matters. *Spanish River*, 155 B.R. at 251, *citing In re Skinner*, 917 F.2d 444, 448 (10th Cir.1990). Therefore, this Court has jurisdiction to enter a final contempt order on the Motion for Sanctions.

█ Feltner violated the Confirmation Order by opposing the transfer of the licenses. He offers two defenses to the Motion for Sanctions. First, Feltner argues that paragraph II.A.3. of the Confirmation Order is too ambiguous to constitute a clear Court order subjecting him to a contempt action. In support, he cites to a hearing conducted by the Court on October 18, 1994, to consider objections to the Confirmation Order. At the hearing, Debtors' counsel argued that the proposed language in paragraph II.A.3. requiring the Debtors and their officers and directors "to supplement as necessary and support approval of the FCC applications" was ambiguous. The Court overruled the objections, stating that "I want the Debtors to do what any seller would do in order to close a sale, which includes transfer of the FCC license." Transcript of October 18, 1994 hearing, pp. 20–21.

Feltner's argument might have had some merit if the scope of affirmative action required to support the FCC Applications was at issue. The specific duties required to affirmatively support the application were not delineated and arguably were subject to interpretation if questioned. That is not the case here. Whatever the affirmative obligations may have been under the Confirmation Order, the Order clearly prohibited Feltner from opposing the transfer of the licenses, which is exactly what he has done.

Feltner's actions were willful. Although Feltner testified that he "chose not to read" the Confirmation Order, the Debtor's counsel, Leslie Cloyd, Esq., testified that Feltner was made aware of its contents. Indeed, at Feltner's insistence, Ms. Cloyd filed a motion for rehearing of the Confirmation Order, which included a specific objection to the language in Paragraph II.A.3 at issue here.

As further evidence of Feltner's willful conduct, the Informal Objections filed with the FCC in February (Exs. 7, 8), were filed *after* the January 10, 1995 hearing on the Program Distributors' Motion for Preliminary Injunction at which the Court announced its finding that the Program Distributors had made a *prima facie* case that Feltner had violated this Court's orders and that his FCC filings constituted an impermissible collateral attack on confirmation.

In sum, Feltner knew full well that the Confirmation Order required him to support the FCC Applications. He willfully and in bad faith violated that Order. His argument that the Confirmation Order was not sufficiently clear is spurious.

■ Feltner argues next that the Confirmation Order improperly impinges upon his First Amendment right to petition the government for redress of grievances, citing cases holding that the First Amendment right is a fundamental right which may not be invaded by the state without a compelling state interest. *See, e.g., Morales v. Turman,* 326 F.Supp. 677 (E.D.Tex.1971). The Court finds Feltner's constitutional arguments inapplicable.

■ First, without government action there can be no First Amendment violation.

*Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). In the INCC Settlement Agreement, Feltner waived and released any right he may have had to object to or oppose the auction sale of the stations, or to oppose the plan of reorganization filed by INCC to implement the sale of the stations. The language in the Confirmation Order requiring the Debtors and Feltner to support the approval of the transfer of the licenses was consistent with and flowed directly from his stipulation to support the sales and the Plan. Court enforcement of a stipulation is not governmental action triggering constitutional protection. *United Egg Producers v. Standard Brands, Inc.,* 44 F.3d 940 (11th Cir.1995).

■ Even absent the stipulation by Mr. Feltner to support the Plan and auction sale, the Court rejects Feltner's constitutional arguments. The Debtors as debtors-in-possession, and Feltner as director and "owner" of the Debtors, have rights and obligations inherent in the Chapter 11 reorganization process. These obligations include the obligation to comply with lawful provisions in a Confirmation Order necessary to implement a plan of reorganization.

Section 1142 of the Bankruptcy Code provides that "the court may direct a debtor and *any other necessary party* to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act ... that is necessary for the consummation of the plan." 11 U.S.C. § 1142 (emphasis added). This Code section would be meaningless if, as in this case, the Debtors' president signs the FCC Applications seeking approval to transfer the licenses and then another officer and director, Feltner, takes affirmative action to thwart the transfer.

■ If Feltner believed that it was important to raise issues with the FCC regarding control and ownership of television stations, he could have and should have taken a direct appeal of the Confirmation Order and sought a stay entitling him to proceed with his FCC petitions pending outcome of his

appeal. *See, e.g.,* the FCC's memorandum opinion and order in *In re Applications of Parsons,* FCC 95–67, 1995 WL 92578 (F.C.C. March 7, 1995). Instead, he chose to willfully ignore the Confirmation Order and to justify his actions by asserting inapplicable constitutional freedoms. The Court concludes that its enforcement of the Confirmation Order, an Order which could have been appealed, does not constitute state action prohibiting free speech.

Moreover, Feltner's true motivation here is not to bring issues before the FCC to promote legislation or rules to serve the public interest. Rather, Feltner's clear and stated motivation was to prevent implementation of the Plan in order to obtain another chance at retaining or recovering ownership of these television stations.

In his "Petition to Deny Application For Transfer of Control of Television Station WNFT–TV, Jacksonville, Florida," Feltner specifically states that he has the financial capacity to continue to operate the stations himself and that the only impediment to his controlling the stations is "the problem with the syndicators." Feltner also urges the FCC to deny the transfer application and to "investigate how this entire transaction was handled by the Bankruptcy Court" (Ex. 5).

Similarly, in his "Petition to Deny Application For Transfer of Control of Television Station WTVX, Ft. Pierce, Florida," Feltner urges the FCC to deny the application and to investigate the actions of the Bankruptcy Court. Feltner expressly states that if the application is denied, it is his intention to regain control of the station (Ex. 6).

Finally, in both Informal Objections, Feltner states that he "now stands ready to resume operation of [the stations]. He is prepared to seek approval from the Bankruptcy Court for a new Plan of Reorganization that will enable him to assume control" of the stations (Exs. 7, 8).

Thus, in his filings before the FCC, Feltner is attempting to do indirectly what he could not do directly—regain his equity in the stations. This impermissible collateral attack on this Court's orders is the primary and overriding objective of Feltner's FCC filings. Feltner's remedy was to appeal the Confirmation Order to the United States District Court, not to take his bankruptcy court concerns to the FCC.

In sum, the Program Distributors have proved by clear and convincing evidence that Feltner has violated the Confirmation Order. He has done so knowingly, willfully and in bad faith. Civil contempt is an appropriate means of redressing these violations.

## REMEDIES

■■■■ Among the remedies available to the Court in a civil contempt proceeding is the ability to impose a fine payable to the complainant in compensation for damages sustained as a result of the contumacious conduct. *Spanish River,* 155 B.R. at 254. The Court also has the authority to incarcerate contemnors who fail to pay Court imposed fines or otherwise comply with the Court's orders. *Id.*

■■■■ The Program Distributors do not seek immediate imposition of a fine. Rather, they request a finding of contempt with sanctions imposed only if Feltner refuses to purge the contempt by withdrawing his petitions and informal objections to the FCC Applications. The Court finds this relief appropriate. Thus, by separate order entered in conformity with this opinion, Feltner will be held in contempt and given five (5) days from the date the order becomes final to purge his contempt by withdrawing his FCC petitions and informal objections to transfer of the licenses.[2] If he fails to purge the contempt, the Court will impose a fine in the amount of $500.00 for each day thereafter that the FCC filings are not withdrawn. The Court will also reserve jurisdiction to enforce this order through additional appropriate sanctions, including incarceration, upon its

**2.** Requiring Feltner to withdraw his objections does not reflect any opinion by this Court on the merits of his objections and certainly does not purport to direct the FCC in any way in its consideration of the FCC Applications or in its broader review of broadcast media attribution rules which may include issues raised in Feltner's objections. See FCC Notice of Proposed Rule Making, released January 12, 1995 (Defendant's Ex. B).

own motion or motion by the Program Distributors.

## CONCLUSION

Owners and directors of Chapter 11 debtors are often reluctant to cooperate in implementing a creditor plan confirmed over their objection. Thus, plan proponents may request provisions in a confirmation order, pursuant to § 1142 of the Code, requiring these unwilling parties to take those actions necessary to implement a confirmed plan.

Feltner is just such a party. After agreeing to support the Plan and then unsuccessfully and impermissibly opposing it in this Court, Feltner, as director of the Debtors, was under Court order to support approval of the FCC license transfers critical to consummating the sales approved in the Confirmation Order. He willfully violated the Court's order and in so doing, he is delaying and seeking to prevent implementation of a Plan that he did not challenge by direct appeal. This bad faith collateral attack cannot be allowed.